## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| **LIZZY JANE FRANCIS PLUG,** | § | |
| **Individually, as Next Friend of M.C.,** | § | |
| **a minor, and on behalf of the Estate of** | § | |
| **Steven Craenmehr, deceased, and** | § | |
| **ELISABETH HENDRIKA SOPHIA** | § | |
| **MARIA SMIT, widow of M.G.H.** | § | **Case No. 5:14-cv-1110** |
| **Craenmehr and mother of Steven** | § | |
| **Craenmehr, Individually,** | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | |
| | § | |
| **SXSW HOLDINGS, INC. f/k/a SXSW** | § | |
| **INC., SXSW LLC f/k/a SXSW** | § | |
| **TRANSITION, LLC, PATRICK** | § | **Jury Trial Demanded** |
| **LOWE, TRAFFIC DESIGN** | § | |
| **CONSULTANTS LLC, and** | § | |
| **RASHAD OWENS,** | § | |
| **Defendants.** | § | |

## PLAINTIFFS' ORIGINAL COMPLAINT

**Hendler Lyons Flores, PLLC**
1301 W. 25th Street, Suite 400
Austin, Texas 78705
Telephone: 512-439-3202
Facsimile: 512-439-3201
www.hendlerlaw.com

Scott M. Hendler
Texas Bar No. 09445500
shendler@hendlerlaw.com

Sean M. Lyons
Texas Bar No. 00792280
slyons@hendlerlaw.com

Rebecca Ruth Webber
Texas Bar No. 24060805
rwebber@hendlerlaw.com

**Law Office of Clem Lyons, PC**
126 Villita Street
San Antonio, Texas 78205
Telephone: 210-225-5251
Facsimile: 210-225-6545
www.clemlyonslaw.com

Clem Lyons
Texas Bar No. 12742000
mdoege@clemlyonslaw.com

ATTORNEYS FOR PLAINTIFFS

# TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................................ 1

II.   PARTIES ..................................................................................................... 1

III.  NATURE OF SUIT, JURISDICTION, AND VENUE ................................. 3

IV.   BACKGROUND AND STATEMENT OF FACTS ...................................... 4

   A.    SXSW: History, Size and Revenues ................................................... 4

   B.    Errant vehicle collisions are a pervasive, well-publicized, and foreseeable risk, making the 2014 SXSW crash a preventable tragedy. ........................................... 6

      1.    Traffic control regulations establish standards for protecting pedestrians and cyclists from traffic around special events ............................................. 7

      2.    The 2004 National Transportation Safety Board Investigation of the Santa Monica Farmer's Market Crash ................................................................. 12

      3.    The 2012 Errant Vehicle Collision on the Austin Hike and Bike Trail ................. 15

      4.    Rigid, water-filled barriers are a ubiquitous sight throughout Austin's Central Business District. ........................................................................ 16

   C.    Excessive alcohol consumption and drunk driving in and around the SXSW festival zone should be well known to SXSW ........................................................ 17

      1.    Austin is number one for alcohol consumption in Texas. ..................................... 17

      2.    Excessive DWI and PI arrests each year at SXSW demonstrate why SXSW should have anticipated the risk of intoxicated drivers and errant vehicles. ................................ 18

   D.    Other factors should have compelled SXSW to guard against errant vehicles. ......... 20

      1.    SXSW knew that festivalgoers would use bicycles to get around the festival. ...... 20

      2.    SXSW had superior knowledge of the risk posed by errant vehicle collisions. ..... 21

      3.    It would not have been onerous for SXSW to secure festival areas from errant vehicular traffic. ........................................................................ 23

      4.    SXSW's Right-of-Way permit gave SXSW legal possession and control of the street where the crash occurred. ...................................................... 24

   E.    The City of Austin's 2014 Post-Event Evaluation. ................................................. 25

   F.    Steven Craenmehr's Life .......................................................................... 26

   G.    The events of the early morning hours of March 13, 2014 ....................................... 30

V.    CAUSES OF ACTION ............................................................................... 31

   Count 1. Negligence by the SXSW Defendants ................................................. 31

      1.    Duty - The SXSW Defendants owed Steven Craenmehr a duty to exercise reasonable care to avoid a foreseeable risk. ...................................................... 31

2.    Breach - The SXSW Defendants breached their duty to Steven Craenmehr.......... 35

3.    Proximate Cause - The SXSW Defendants' failure to exercise ordinary care proximately caused Steven Craenmehr's death. ............................................................... 36

4.    Gross Negligence – The SXSW Defendants were grossly negligent. ................... 39

5.    Joint and Several Liability of the SXSW Defendants............................................ 39

Count 2. Negligence Per Se by the SXSW Defendants ........................................................ 40

1.    The City of Austin Ordinance governing temporary street closures for festivals was designed to protect Steven Craenmehr. ............................................................................. 40

2.    Tort liability may be imposed under the Ordinance governing temporary street closures for festivals. ............................................................................................................ 40

3.    The SXSW Defendants' violation of the Ordinance proximately caused Steven Craenmehr's death. ............................................................................................................. 41

4.    Gross Negligence - The SXSW Defendants were grossly negligent. .................... 43

5.    Joint and Several Liability of the SXSW Defendants............................................ 43

Count 3. Negligent Voluntary Undertaking by the SXSW Defendants............................... 43

1.    The SXSW Defendants owed a legal duty to Steven Craenmehr. ......................... 44

2.    The SXSW Defendants breached their legal duty to Steven Craenmehr................ 46

3.    The SXSW Defendants' negligent performance of their voluntary undertaking increased Steven Craenmehr's risk of harm. ....................................................................... 46

4.    Steven Craenmehr relied on the SXSW Defendants' traffic control measures. ..... 46

5.    The SXSW Defendants' negligence proximately caused Steven Craenmehr's death........................................................................................................................................ 46

6.    Gross Negligence – The SXSW Defendants were grossly negligent. ................... 47

7.    Joint and Several Liability of the SXSW Defendants............................................ 48

Count 4. Premises Liability of the SXSW Defendants ........................................................ 48

1.    The SXSW Defendants were the temporary occupiers of the premises. ............... 48

2.    Because Steven Craenmehr was an invitee of SXSW, the SXSW Defendants owed him the highest duty of care.................................................................................................. 48

3.    The condition created by the SXSW Defendants' failure to deploy adequate traffic control measures posed an unreasonable risk of harm to invitees. ................................... 49

4.    The SXSW Defendants had actual knowledge of the dangerous condition. .......... 50

5.    The SXSW Defendants knew or should have known the dangerous condition posed an unreasonable risk to Steven Craenmehr.................................................................... 50

6.    The SXSW Defendants breached their legal duty to Steven Craenmehr by failing to reduce, eliminate, or warn of the risk of an errant vehicle. ............................................. 52

7.  The SXSW Defendants' breach proximately caused Steven Craenmehr's death and the Plaintiffs' damages..................................................................................... 53

8.  Alternatively, the SXSW Defendants released a dangerous agency onto the roadway adjacent to the premises that they controlled. ..................................... 54

9.  Joint and Several Liability of the SXSW Defendants.............................................. 55

Count 5. Public Nuisance by the SXSW Defendants ............................................. 56

1.  The SXSW Defendants' conduct was a public nuisance. ...................................... 56

2.  Steven Craenmehr's wife and child have common-law standing to bring a public nuisance cause of action.......................................................................................... 56

3.  Joint and Several Liability of the SXSW Defendants............................................. 57

Count 6. Negligent Hiring, Supervision, Training, and Retention by SXSW ..................... 57

1.  Duty......................................................................................................................... 57

2.  Breach ..................................................................................................................... 58

3.  Proximate Cause ..................................................................................................... 59

4.  Gross Negligence .................................................................................................... 60

5.  Joint and Several Liability of the two SXSW entities ............................................ 60

Count 7. SXSW's Breach of Warranty .................................................................... 61

1.  SXSW sold services to Steven Craenmehr. ........................................................... 61

2.  SXSW made representations to Steven Craenmehr about the quality of its services..................................................................................................................... 61

3.  SXSW's representations became part of basis of the bargain with Steven Craenmehr.............................................................................................................. 61

4.  SXSW breached its warranty to Steven Craenmehr. .............................................. 61

5.  SXSW's breach of its warranty to Steven Craenmehr proximately caused Steven Craenmehr's death. ............................................................................................... 61

6.  Joint and Several Liability of the two SXSW entities ............................................ 63

Count 8. Negligence by Rashad Owens.................................................................... 64

1.  Duty - Rashad Owens owed a legal duty to Steven Craenmehr. ........................... 64

2.  Breach - Rashad Owens breached his legal duty to Steven Craenmehr. ............... 64

3.  Causation - Rashad Owens' breach of his legal duty to Steven Craenmehr was a cause of Steven Craenmehr's death. ...................................................................... 64

4.  Gross Negligence - Rashad Owens was grossly negligent. ................................... 65

VI.  DAMAGES ................................................................................................... 65

A.  Survival Damages for Personal Injuries to Steven Craenmehr ................................ 65

B.  Wrongful Death Damages ......................................................................................... 66

C.    Punitive Damages ....................................................................................................... 67

VII.    DEMAND FOR JURY TRIAL.................................................................................... 67

VIII.    PRAYER ..................................................................................................................... 68

## LIST OF EXHIBITS

Exhibit 1. SXSW.com - "first timer's guide"

Exhibit 2. Docs showing failure to reimburse City of Austin for public safety costs

Exhibit 3. SXSW.com - sxsw is everywhere

Exhibit 4. City of Austin Post-Event Evaluation Report

Exhibit 5. MUTCD - rigid barriers

Exhibit 6. Ads for rigid barrier and pallet jack

Exhibit 7. Texas MUTCD - rigid barriers

Exhibit 8. City of Austin Transportation Criteria Manual

Exhibit 9. 804 Series Standard Details

Exhibit 10. NTSB Report: Farmer's Market Santa Monica, California

Exhibit 11. Austin officials seek permanent trail safety barriers on Cesar Chavez, Austin American-Statesman, July 13, 2014

Exhibit 12. Photos of rigid barriers throughout Austin's Central Business District

Exhibit 13. Traffic Control Plan

Exhibit 14. Does Austin have a drinking problem?, Austin American-Statesman, March 15, 2014

Exhibit 15. America's Drunkest Cities of 2011, From Las Vegas to Boston, Daily Beast

Exhibit 16. The Top 10 Austin Top 10 Lists, KUT

Exhibit 17. Austin police chief says Texas leads nation in drunk driving deaths, Politifact, Nov. 18, 2010

Exhibit 18. Permit Application for Temporary Closure for a Right of Way Event

Exhibit 19. Map of APD's George Sector

Exhibit 20. DWI and PI arrests in Central Business District 2009-1014

Exhibit 21. SXSW.com - bike communting

Exhibit 22. Texas Board of Engineering search for Patrick Lowe

Exhibit 23. City of Austin Transportation Department Right-of-Way Permit

Exhibit 24. Pictures of family

Exhibit 25. SXSW receipt

Exhibit 26. Austin City Code, Title 14 Use of Streets and Public Property, Chapter 14-8 Temporary Closure for Right-of-Way Event

## I.  INTRODUCTION

1.  Lizzy Jane Francis Plug, the young widow of Steven Craenmehr, brings this lawsuit in three capacities: (1) on behalf of herself, (2) on behalf of M.C., her and Steven's two-year-old child, and (3) on behalf of Steven Craenmehr's estate and with Elisabeth Hendrika Sophia Maria Smit, the mother of Steven Craenmehr, against SXSW Holdings, Inc. and SXSW LLC, the two for-profit companies that own and operate the SXSW music festival. In addition, this lawsuit is against Patrick Lowe, SXSW's traffic design consultant who was designated as the person responsible for SXSW's street closures and Mr. Lowe's company, Traffic Design Consultants, LLC. This lawsuit is also against Rashad Owens, the driver of the vehicle that collided with SXSW attendees.

2.  The SXSW crash of March 13, 2014 was a preventable tragedy. It was foreseeable and predictable that an errant vehicle (whether driven by a drunk driver, a tired driver, or an elderly and confused driver) might drive into the cordoned-off area on Red River Street because there are 20,000 errant vehicle incidents in the United States each year. The owners, planners, and organizers of a downtown urban music festival should have recognized that risk given their nearly three decades of experience holding the festival. If SXSW had adhered to industry standards and utilized adequate traffic control measures, Steven Craenmehr would be alive today.

## II.  PARTIES

3.  Plaintiff LIZZY JANE FRANCIS PLUG is a resident of Amsterdam, Netherlands, and is the wife of Steven Craenmehr, deceased. M.C., her son, is a resident of Amsterdam, Netherlands, and is the biological child of Steven Craenmehr, deceased. Lizzy Plug brings this suit for damages suffered and sustained by her and M.C. as a result of the wrongful death of Steven

Craenmehr pursuant to TEXAS CIVIL PRACTICE AND REMEDIES CODE section 71.004. In addition, M.C. is the only heir-at-law to the estate of Steven Craenmehr and therefore, Lizzy Plug brings this suit on behalf of M.C. and Steven Craenmehr's estate for damages suffered and sustained by Steven Craenmehr pursuant to TEXAS CIVIL PRACTICE AND REMEDIES CODE section 71.021.

4.    Plaintiff ELISABETH HENDRIKA SOPHIA MARIA SMIT, widow of M.G.H. Craenmehr, [hereinafter "Lidy"] is a resident of Heerenveen, Netherlands and is the mother of Steven Craenmehr, deceased. Lidy Smit brings this suit for damages suffered and sustained by her as a result of the wrongful death of Steven Craenmehr pursuant to TEXAS CIVIL PRACTICE AND REMEDIES CODE section 71.004.

5.    Defendant SXSW HOLDINGS, INC. (formerly known as SXSW, INC.) is a corporation duly organized and existing under the laws of the State of Texas, with its principal place of business in the State of Texas. This Defendant may be served with process by serving its registered agent, Roland Swenson, 400 Bowie Street, Austin, Texas 78703.

6.    Defendant SXSW, LLC (formerly known as SXSW Transition, LLC) is a limited liability company duly organized and existing under the laws of the State of Texas, with its principal place of business in the State of Texas. This Defendant may be served with process by serving its registered agent, CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201-3136.   SXSW Holdings, Inc. and SXSW, LLC will be referred to collectively in this complaint as "SXSW."

7.    Defendant Patrick Lowe is an individual and a citizen of the State of Texas and may be served with process at his place of business, Traffic Design Consultants, 128 Bonham Lane, Paige, Texas 78659.

8. Defendant Traffic Design Consultants, LLC is a limited liability company duly organized and existing under the laws of the State of Texas, with its principal place of business in the State of Texas. This Defendant may be served with process by serving its registered agent, Patrick Lowe at 128 Bonham Lane, Paige, Texas 78659. Patrick Lowe, Traffic Design Consultants, LLC and SXSW will be referred to collectively in this complaint as "the SXSW Defendants."

9. Defendant Rashad Owens is an individual and a resident of the State of Texas and may be served with process at the Travis County Jail where he has been incarcerated since March 13, 2014.

### III.   NATURE OF SUIT, JURISDICTION, AND VENUE

10. This is a Texas wrongful death and survival action arising from Defendants' negligence, premises liability, and other wrongful acts which caused the death of Steven Craenmehr on March 13, 2014 in downtown Austin, Travis County, Texas.

11. Plaintiffs bring this action as the surviving spouse, as the legal representative of Steven Craenmehr's sole heir, on behalf of Steven Craenmehr's estate, and as the surviving parent. See TEX. CIV. PRAC. & REM. CODE §§ 71.000, *et seq.*

12. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1) and (2) because Defendants reside in this district and because substantially all of the events or omissions giving rise to the claims occurred in this district.

13. This Court has jurisdiction pursuant to 28 U.S.C. § 1332 because the Plaintiffs' damages exceed $75,000.00 exclusive of interest and costs and the Plaintiffs are not citizens or residents of the same state as any of the Defendants.

## IV.   BACKGROUND AND STATEMENT OF FACTS

### A.  <u>SXSW: History, Size and Revenues</u>

14. Beginning in March 1987, and continuing every year in March since, the City of Austin, Texas is the site of one of the largest music festival of its kind in the world − South by Southwest (SXSW). In 2014, the music portion of the festival alone drew over 28,000 credentialed badge holders who came to hear more than 2,000 bands, attend conferences, and network with other members of the music industry from around the world. According to the festival's website, "SXSW is more than just a conference. You'll be attending sessions, meeting potential clients, attending screenings, networking at clubs, and hopping from one showcase to the next."[1]

15. SXSW began as an obscure music festival with approximately 700 participants.  Over the last 27 years, it has mushroomed into a world-renowned event comprised of a film component, an interactive component, and a live music component. The festival attracts attendees and participants from multiple countries, including the Netherlands. In 2014, approximately 80,000 registered participants descended on Austin to attend various parts of the festival. In addition, SXSW issued more than 150,000 guest passes and drew a record-setting total festival attendance. In addition, upwards of 100,000 additional people participate without official credentials.

16. In 2014, the cost for attending the SXSW music festival ranged from $625 to $1695. For this fee, registrants received festival credentials that allowed them access to the SXSW music venues. While the festival admittedly generates substantial economic benefit for a discrete segment of the Austin economy, SXSW produces substantial profits for its owners. The SXSW festival is owned by SXSW Holdings. The officers and directors of SXSW Holdings include

---

[1] See "First Timer's Guide" screen shot, attached as **exhibit 1**.

Roland Swenson, Louis Black, and Niccolo Barbaro. In 2012, the officers and directors of

SXSW Holdings established SXSW, LLC. SXSW Holdings is the managing member of, and

controls, SXSW, LLC. Both of these entities are private, for-profit companies.

17. SXSW's 2014 revenues from the sale of credentials to attend only the music portion of

the festival far exceeded ten million dollars. Despite total annual revenues in the tens of millions

of dollars, SXSW applies for—and receives—hundreds of thousands of dollars in fee waivers

from the City of Austin.[2] SXSW does not fully reimburse the citizens of Austin for the fees for

services such as extra police, fire, and EMS costs that the City of Austin ordinarily requires other

event organizers to pay. In addition, SXSW keeps its overhead low by taking advantage of a

largely volunteer workforce enticed by the lure of access to the official SXSW events.

18. Unlike most other music festivals, such as the Austin City Limits Music Festival held

within the confines of Zilker Park or numerous jazz festivals held around the world in discrete

locations, SXSW does not take place at a single, dedicated location; instead the festival takes

place simultaneously at almost 100 official SXSW designated venues throughout the City.[3] The

nearly 100 official SXSW music venues for the 2014 festival included hotels, churches and

festival centers, as well as numerous bars. For 2014, SXSW published a detailed schedule of

festival music "showcases" taking place − often between 9 p.m. and 2 a.m. − at the dozens of

official SXSW bar venues throughout Austin, including at no less than 10 official venues on Red

River Street.

19. According to the City of Austin's 2014 Post-Event Evaluation Report, SXSW has

become a "Spring Break destination" where "crowd management is worsening," "alcohol

---

[2] See documents showing unreimbursed public safety costs for the 2014 SXSW festival, attached as **exhibit 2**.
[3] See screen shot of "See Showcasing Bands in Your Hotel", available at http://sxsw.com/music/news/2014/2nd-play-stages-see-showcasing-bands-your-hotel, attached as **exhibit 3**.

*Lizzy Plug, et al. v. SXSW, et al.*, Plaintiffs' Original Complaint

consumption [has become] a major issue," "many venues operate at or near capacity," "many of the events [are] ill-planned" and SXSW's "lack of coordination with [Austin Center for Events] prior to events results in public safety personnel having to react to situations rather than a safer, pro-active event management mode."[4]

20. To take in as many SXSW band performances as possible, or to see the desired mix of bands, festivalgoers were encouraged to travel all over Austin's Central Business District from one official SXSW venue to another. By downloading an app and following the directions on their smartphones, SXSW attendees would be, as SXSW described it, "networking at clubs, and hopping from one showcase to the next."[5]

**B.  Errant vehicle collisions are a pervasive, well-publicized, and foreseeable risk, making the 2014 SXSW crash a preventable tragedy.**

21. In 2003, an addled elderly man drove through a street closure sign and plowed into the farmer's market in Santa Monica, killing or injuring 73 individuals.

22. In 2006, at the 55th annual Madison Regatta in Indiana, a teenager drove through an unfortified road barricade with his vehicle and into a crowd of thousands of race-watchers. Ten people were seriously injured.

23. In May 2012, a driver falling asleep at the wheel failed to navigate the slight curve on Cesar Chavez along the Austin Hike and Bike trail and careened over the curb into two people out for a morning walk along the lake. One pedestrian was killed and the other was severely injured.

---

[4] *See* 2014 SXSW Post-Event Evaluation Report, attached as **exhibit 4**.
[5] See screen shot of "See Showcasing Bands in Your Hotel", available at http://sxsw.com/music/news/2014/2nd-play-stages-see-showcasing-bands-your-hotel, attached as **exhibit 3**.

*Lizzy Plug, et al. v. SXSW, et al.*, **Plaintiffs' Original Complaint**

24. In August 2013, a man drove into the Venice Beach, California Boardwalk running down pedestrians, killing one and injuring 16.

25. In August 2014, a driver collided with shoppers and vendors at a street market in New Jersey, killing one person.

26. On November 2, 2014, a pick up truck was unable to negotiate a curve on a Seattle street and plowed into the store front window of a Starbucks.

27. Every year thousands of drivers make a wrong turn or lose control, propelling their vehicles into places they are not supposed to go. There are approximately 20,000 errant vehicle collisions annually in the United States. The problem is pervasive and well known to traffic control engineers and traffic plan design consultants. Errant vehicle collisions with pedestrians and cyclists pose a risk of serious injury or death. This truth is borne out every time an errant vehicle collides with a pedestrian or cyclist. The safety of the public is a principal reason that the U.S. Department of Transportation and the State of Texas have promulgated guidelines for utilizing proper traffic control measures where temporary street closures are planned to host special events such as the SXSW music festival and why the City of Austin has mandated that traffic control measures conform to these standards.

   1. **Traffic control regulations establish standards for protecting pedestrians and cyclists from traffic around special events.**

   *a.  Federal Manual on Uniform Traffic Control Devices*

28. The Manual on Uniform Traffic Control Devices (MUTCD) is produced under the authority of the U.S. Department of Transportation, Federal Highway Administration and sets forth the basic principles and standards for the design and use of traffic control devices for all streets and highways open to public travel, regardless of type or class or the pubic agency having

jurisdiction. Chapter 6F of the MUTCD provides specific guidelines and minimum standards for

separating pedestrian and bicycle traffic from motor vehicle traffic during special events.[6]

29. Section 6F.85 of the Manual on Uniform Traffic Control Devices describes the use of

temporary traffic barriers:

> Temporary traffic barriers are devices designed to help prevent penetration by vehicles while minimizing injuries to vehicle occupants, and designed to protect workers, bicyclists and pedestrians. . . . .They are also used for certain special events or in other temporary traffic control contexts where separation and channelization of vehicle and pedestrian movement are needed.

The MUTCD defines crash cushions in section 6F.86:

> Crash cushions are systems that mitigate the effects of errant vehicles that strike obstacles, either by smoothly decelerating the vehicle to a stop when hit head on, or by redirecting the errant vehicle. The two types of crash cushions that are used in temporary traffic control zones are stationary crash cushions and truck mounted attenuators.

One example of such a "stationary crash cushion" is a plastic, water-filled barrier also known as

a jersey barrier or a K-rail. Plastic, water-filled barriers are specifically designed for temporary

use around construction zones or large public events. When empty, these barriers are easily set

up and taken down; however when filled with water, they are half as heavy as the cement

variety. These barriers can also be filled with sand, gravel, and other ballast materials. A single

person can easily and quickly move a water-filled barrier using a hand-operated pallet jack.[7] A

hand-operated pallet jack operator can be assigned at a *de minimus* cost at key intersections or

access points where the need for emergency vehicle access is anticipated because of the

proximity to a hospital or firehouse or emergency medical station, or to maintain access for other

authorized vehicles such as those of residents. Moreover, the barriers can be sufficiently drained

---

[6] See MUTCD, chapter 6F, sections 85 and 86, attached as **exhibit 5**.
[7] See advertisements for rigid barrier with "Pallet Jack slots at bottom [that] allow for easy movement and transport" and advertisement for hand-operated pallet jack, attached as **exhibit 6**.

and moved by one person without the aid of a pallet jack in less than one minute in the event of an emergency. These barriers are readily available for rent or sale from traffic control device companies and are a ubiquitous sight around downtown Austin's Central Business District. Thus, these water-filled barriers are an optimal solution to be used anywhere pedestrians and bicyclists should be separated from moving vehicles. SXSW could have easily employed such traffic control devices for the protection of pedestrians and bicyclists, but inexplicably did not do so.

### b. *Texas Manual on Uniform Traffic Control Devices*

30. The State of Texas has adopted the Federal Manual on Uniform Traffic Control Devices. It is incorporated by reference in the TEXAS ADMINISTRATIVE CODE, Title 43, section 25.1 and is recognized as the Texas standard for all traffic control devices installed on any street, highway, bikeway or private road open to public travel in Texas. It is adopted in accordance with 23 U.S.C. §§ 109(d) and 402(a).[8] The Manual is issued under the authority of the TEXAS TRANSPORTATION CODE, Chapter 544. Pursuant to the City of Austin's Standards Specifications Manual, Item 803S, it is a Right-of-Way permit holder's responsibility to ensure that all temporary traffic control barricades must, at a minimum, comply with the Texas MUTCD.

### c. *City of Austin Transportation Criteria Manual*

31. Section 8 of the City of Austin Transportation Criteria Manual (CATCM) addresses the "standardization of traffic control and traffic control devices."[9] Specifically, section 8.5.1 speaks to the use of temporary traffic control devices.  It is meant to be "a guiding philosophy of good temporary traffic control for the practitioner."[10] The Manual directs the user to refer to the Texas

---

[8] See Texas MUTCD, attached as **exhibit 7**.
[9] See Section 8.1.0 of the City of Austin Transportation Criteria Manual, attached as **exhibit 8**.
[10] Section 8.5.1, attached as **exhibit 8**.

*Lizzy Plug, et al. v. SXSW, et al.*, Plaintiffs' Original Complaint

Manual on Uniform Traffic Control Devices when looking for "specific standards and warrants." Section 8.5.1(B) provides that traffic control devices are used as a means to provide traffic safety in temporary traffic control areas.

32. The City of Austin Transportation Criteria Manual describes the term traffic control as a means of "Incident Management". The definition of "Incident" in section 8.5.2 includes a "special event."[11] A special event can be things "such as parades, sporting events and non construction street closures for filming and street events."[12] Temporary control devices, such as barricades, when used during such special events, "shall be set up and removed . . . in accordance with the current edition of the Texas Manual On Uniform Traffic Control Devices and this section."[13] Pedestrian safety is cited as an important consideration in planning any special event.

33.  Section 8.5.1(B) states that "[t]raffic safety in temporary traffic control areas should be an integral and high-priority element of every project from planning through design and construction" and that special events should be planned and implemented with pedestrian safety in mind at all times. Section 8.5.1(B) goes on to state that each special event is different and that a traffic control plan, in detail appropriate to the complexity of the event, should be prepared and understood by all responsible parties before the site is occupied.

34. Section 8.5.3(G) of the CATCM makes clear that pedestrian safety in the special event zone is the responsibility of the permit-holder and it is their job to ensure that necessary safety concerns are addressed, and that there is a competent and trained person on-site to ensure compliance with applicable safety and traffic related rules, regulations, and standards.

---

[11] See section 8 of the City of Austin Transportation Criteria Manual, attached as **exhibit 8**.
[12] Section 8.5.2(B)(2), attached as **exhibit 8**.
[13] Section 8.5.2(B)(2)(d), attached as **exhibit 8**.

35. Section 8.5.1(E) of the CATCM also requires that the permit-holder routinely inspect all temporary traffic control devices to ensure that they "conform to the traffic control plan, and are effective in providing safe conditions for motorists, pedestrians, and workers." Moreover, section 8.5.5(A) of the CATCM states that "[e]very effort should be made to separate pedestrian movement from…adjacent traffic."

### d. The 804 Series Standard Details

36. An industry standard that is adopted by various states and municipalities including the City of Austin is called the 804 Series Standard Details. The 804 Series as adopted by the City of Austin provides additional guidance to event planners and traffic control consultants for planning traffic control around events where planners anticipate large numbers of pedestrians and bicyclists.[14]

37. Standard No. 804S-5 of the 804 Series Standard Detail specifically states that "Barricades are located adjacent to traffic and are therefore subject to impact with errant vehicles…[thus] all barricade systems should be crashworthy." This Standard goes on to state that, under certain circumstances, "additional…barricading…may be required depending on the field conditions" and it is the permit holder's job to ensure that a competent person for traffic control is designated and that person "shall make inspections of the traffic control device at least two (2) times a day…ensuring that all devices are in their proper place and are in working order"—*i.e.* they are capable of effectively separating pedestrians from motor vehicles—including errant vehicles.[15]

---

[14] See 804 Series Standard Details, section S-5 and S-6, attached as **exhibit 9**.
[15] See Standard No. 804S-5 at pp. 4 and 12, attached as **Exhibit 9**.

38. The abundance of traffic control standards, manuals and guidelines that establish best practices makes SXSW's failure to deploy adequate traffic control measures inexcusable when it expected thousands of pedestrians and bicyclists to attend its festival.

### 2. The 2004 National Transportation Safety Board Investigation of the Santa Monica Farmer's Market Crash

39. One of the most high profile errant vehicle tragedies occurred in 2003, when an addled elderly man drove through a street closure sign and plowed into the farmer's market in Santa Monica, killing or injuring 73 individuals. The National Transportation Safety Board (NTSB) conducted an in-depth investigation regarding this errant vehicle crash and published a 50-page report in 2004 detailing its findings and recommendations.[16]

40. Anyone involved with planning street closures to host pedestrian-oriented events such as the SXSW festival is, or certainly should be, familiar with the Santa Monica Farmer's Market errant vehicle crash and the published report of the NTSB investigation.

41. The NTSB's strongest recommendation was that the traffic control planners responsible for the farmer's market should have deployed rigid barricades capable of absorbing and deflecting oncoming vehicles to prevent penetration by the moving vehicle into the pedestrian zone. Had such rigid barricades been properly deployed and in use, the driver of the errant vehicle would not have been able to penetrate the pedestrian zone and the injuries and fatalities would not have occurred.

42. On July 16, 2003, in the middle of the afternoon, a Buick sedan driven by an 86-year-old male struck the rear corner of another vehicle that was stopped for pedestrians in a crosswalk at

_____

[16] See NTSB Highway Accident Report: Rear-End Collision and Subsequent Vehicle Intrusion Into Pedestrian Space at Certified Farmer's Market Santa Monica, California July 16, 2003, attached as **exhibit 10**.

the intersection. The Buick continued through the intersection and past a "road closed ahead" sign. The errant vehicle proceeded through the farmer's market striking pedestrians and vendor displays for two and a half blocks from where it entered the pedestrian zone before coming to rest.

43. The NTSB reported that witnesses stated that the driver accelerated after initially striking the vehicle stopped at the crosswalk. The report cites one witness who stated he observed no brake lights on the Buick. A second witness told investigators that he saw the driver of the errant vehicle with both hands on the steering wheel at the 10- and 2-o'clock positions, looking straight ahead. Still other witnesses described to police investigators the errant vehicle's movements through the farmer's market area as alternating between accelerating and decelerating, sometimes at high engine RPMs, as if the driver were pressing the accelerator pedal firmly. The driver of the errant vehicle stated to police investigators that he felt the vehicle accelerate three or four times as he proceeded through the farmer's market. Another witness stated that it appeared that every time the Buick struck an object in its path, the vehicle accelerated in response. A post-accident inspection and test of the Buick found no defect, deficiency, or abnormality in the vehicle's throttle controls, nor were any leaks, restrictions, or operational defects found in the brake assembly. The roadway where the market was held was a straight, level, asphalt, undivided street; it had one travel lane each westbound and eastbound. The farmer's market had been a regular event at this location in Santa Monica for 22 years.

44. As a result of this errant vehicle collision, ten pedestrians sustained multiple blunt force or traumatic injuries that proved fatal and an additional 63 people were injured, 18 seriously. This tragedy was widely reported through national media outlets and has been a prominent case study for traffic control engineers and traffic planning design consultants since 2004.

45. The core facts of the Santa Monica crash are strikingly similar to what occurred on Red River Street in Austin at the 2014 SXSW festival: both errant vehicles intruded into a street marked by a road-closed sign; both errant vehicles continued for two blocks; witnesses of both incidents stated that they saw the vehicles accelerate and did not see brake lights; and both errant vehicles caused multiple deaths and injured dozens.

46. Possibly the NTSB's most prophetic conclusion about the Santa Monica errant vehicle incident was that encouraging patrons of the farmer's market and other pedestrians to occupy the roadway when it was closed should have led planners and organizers to deploy rigid barriers to protect those pedestrians from vehicular traffic.[17] This conclusion alone should have put SXSW and its planners and organizers on notice of the risk an errant vehicle posed to SXSW festivalgoers, and made the 2014 SXSW crash a preventable tragedy.

47. Following the crash, vendors in the Santa Monica farmer's market, recognizing the need for more substantial protection from errant vehicles, moved their personal vehicles to block access to the roadway, but the NTSB report noted that vehicles are not generally an appropriate countermeasure for this purpose because vehicles are not specifically designed to absorb a collision or to redirect an errant vehicle. In addition, vehicles are not safe traffic control measures because they contain flammable liquids and components, and other more appropriate options are available to protect pedestrians from errant vehicles.[18]

48. The NTSB report concluded that a rigid barrier system would very likely have prevented the errant vehicle from intruding into the pedestrian area. This conclusion should not have been lost on SXSW and its planners and organizers.

_____

[17] See **exhibit 10**, at p. 44.
[18] See **exhibit 10**, at p. 44.

49. The NTSB Report, issued in 2004—10 years before the SXSW crash—stated that the Board would inform the American Association of State Highway and Transportation Officials, the American Public Works Association, the United States Conference of Mayors, the National Association of Counties, and the National Association of Towns and Townships of the circumstances of the Santa Monica farmer's market errant vehicle collision and emphasize the importance of physical barriers in protecting the public at farmer's markets and similar events. The Report was widely distributed and readily available to traffic design consultants and planners and even the public at large. It was surely as readily accessible to SXSW, a sophisticated e-commerce vendor.

50. The notoriety of this event, the resources expended by the NTSB to investigate and analyze this event, the subsequent publication and distribution of the NTSB report, and the availability and use of the Report as a case study made the circumstances of the March 13, 2014 SXSW errant vehicle collision readily foreseeable. Moreover, had SXSW planners and organizers followed the recommendations of the NTSB that grew out of the Santa Monica errant vehicle collision by deploying adequate rigid barriers around the perimeter of the area under its control on Red River, the SXSW Defendants could have prevented the tragedy that resulted in multiple injuries and deaths on March 13, 2014.

### 3. The 2012 Errant Vehicle Collision on the Austin Hike and Bike Trail

51. There was another, more recent errant vehicle collision that caused serious injury and death to pedestrians in the Central Business District of Austin, the very district SXSW designated for its festival. In the spring of 2012, a driver falling asleep at the wheel failed to navigate a slight curve on Cesar Chavez along the Butler Hike and Bike Trail in Austin and

careened over the curb into two people out for a morning walk along the lake.[19] One pedestrian was killed and the other was severely injured. Shortly thereafter the City of Austin deployed rigid barricades designed to deflect an errant vehicle and prevent a similar incident from recurring. This Austin Hike and Bike Trail collision—well publicized and a mere two years before the 2014 SXSW tragedy—made the danger of errant vehicle incidents that much more foreseeable to SXSW planners and organizers.

52. This event would have led an ordinarily prudent person planning a music festival in Austin like SXSW to anticipate the risk posed by an errant vehicle collision. This is all the more so where SXSW expected well over 40,000 people to attend the festival and where SXSW assumed control of various streets that SXSW intended to close to vehicle traffic because of the pedestrian and bicycle traffic expected from invited festival attendees.

### 4. Rigid, water-filled barriers are a ubiquitous sight throughout Austin's Central Business District.

53. For several years leading up to the 2014 SXSW festival and continuing throughout 2014, Austin has been undergoing a construction boom. Construction sites throughout the Central Business District have deployed rigid barriers that are often water-filled or otherwise fortified. The use of such rigid barriers throughout Austin's Central Business District is a ubiquitous sight that highlights the need for these types of traffic control measures during a street festival that is surrounded and crisscrossed by active motor vehicle traffic.[20] The sight of such barriers is so common that one cannot travel through Austin's Central Business District without seeing multiple locations utilizing these types of rigid barriers. For instance, as of November 2014,

---

[19] See Austin American-Statesman article attached as **exhibit 11**.
[20] See photographs of rigid barriers throughout the Central Business District, attached as **exhibit 12**.

*Lizzy Plug, et al. v. SXSW, et al.*, **Plaintiffs' Original Complaint**

there are rigid barriers at the following locations in the Central Business District to separate

pedestrians from motor vehicles:[21]

- 2nd Street & Congress Avenue,

- 5th Street & Trinity Street,

- 9th Street & Neches Street,

- 15th Street & Trinity Street,

- Cesar Chavez Street & San Antonio Street,

- Cesar Chavez Street & Lamar Avenue,

- Guadalupe Street & Martin Luther King Boulevard,

- South First Street & Riverside Drive (near Auditorium Shores entrance),

- 4th Street & Colorado Street,

- 5th Street & Colorado Street, and

- 7th Street & Colorado Street.

In fact, on March 13, 2014, rigid water-filled barriers were in use at 7th Street and Red River

Street to channel SXSW traffic into a parking garage.[22]

    C.  **Excessive alcohol consumption and drunk driving in and around the SXSW festival zone should be well known to SXSW.**

        1.  **Austin is number one for alcohol consumption in Texas.**

54. The zip code for Austin's Central Business District, 78701, leads the state for alcohol

consumption.[23] According to Austin Police Chief Art Acevedo, the drunken driving-related

---

[21] See photographs of rigid barriers throughout the Central Business District, attached as **exhibit 12**.
[22] See Traffic Control Plan, at p. __, attached as **exhibit 13**.
[23] See Austin American-Statesman story, attached as **exhibit 14**, Daily Beast article, attached as **exhibit 15**, and KUT.org article attached as **exhibit 16**.

*Lizzy Plug, et al. v. SXSW, et al.*, Plaintiffs' Original Complaint

death rate in Texas is among the highest in the United States.[24]  Over the course of the past decade, Travis County has had the highest per capita alcohol consumption rate of any county in Texas by far – estimating an average of $410.05 in alcohol sales per capita, per year during that time period.[25] SXSW places its festival in Austin's Central Business District.[26] Whether Texas leads the nation in DWI related fatalities or Austin's 78701 zip code is among the highest in Texas for alcohol consumption, there is no question that the SXSW Defendants should have known that excessive alcohol use and driving while intoxicated during the SXSW festival threatened public safety.

### 2.  Excessive DWI and PI arrests each year at SXSW demonstrate why SXSW should have anticipated the risk of intoxicated drivers and errant vehicles.

55. Over the five years preceding the 2014 SXSW festival—from 2009 to 2013—there were 527 arrests for public intoxication or driving while intoxicated during the SXSW festival in the specific area of downtown Austin where the festival is held. The Austin Police Department refers to this area of downtown as the "George Sector" and it encompasses Austin's Central Business District where the SXSW festival takes place.[27] George Sector is bordered on the east by Chicon Street, on the west by Lamar Boulevard, on the north by 11th Street, or 12th Street where 12th Street exists, and on the south by Lady Bird Lake. This discrete area of Austin, fully encompassing the Central Business District, is where the SXSW festival primarily takes place and where the errant vehicle collision of March 13, 2014 occurred.

---

[24] See and PolitiFact article attached as **exhibit 17**.
[25] Id.
[26] See Right-of-Way Permit Application designating Central Business District as location of SXSW Music Festival, attached as **exhibit 18**.
[27] See the map of the "George Sector" attached as **exhibit 19** and APD Public Information Request Response re SXSW arrests for George Sector during SXSW festival for 2009-2014, attached as **exhibit 20**.

*Lizzy Plug, et al. v. SXSW, et al.*, Plaintiffs' Original Complaint

56. Of the 527 alcohol related arrests during the week of SXSW from 2009 to 2013, there were 171 arrests for driving while intoxicated and 356 arrests for public intoxication in the specific area of downtown Austin for which SXSW obtained permits to host its festival and where it implemented its Traffic Control Plan.[28]

57. During the week of SXSW within the George Sector the numbers break down as follows: In 2009, there were 39 arrests for driving while intoxicated (DWI) and 18 for public intoxication (PI); in 2010 there were 32 DWIs and 78 PIs; in 2011 there were 17 DWIs and 102 PIs; in 2012 there were 37 DWIs and 70 PIs; and in 2013 there were 46 DWIs and 88 PIs.[29]  These facts are public information and are readily available to anyone, including SXSW and its planners and organizers, from the Austin Police Department. These arrests demonstrate that every year during SXSW for at least the last 5 years, intoxicated drivers were driving in the very area where the 2014 incident occurred, making a collision involving such a driver a genuine and readily foreseeable risk. Given that the majority of SXSW venues are bars with liquor licenses, the fact that substantial alcohol consumption would take place should have been obvious to the SXSW Defendants. And given the intoxication related arrests for the previous five years, it was not only a risk that there would be intoxicated drivers in and around the SXSW festival, it was a foregone conclusion.

58. During the 2014 SXSW festival, there were 328 intoxication related arrests citywide, and 63 of those arrests occurred in the Central Business District of Austin.[30] Nearly 20% of the

---

[28] See Application for Right-of-Way Permit, attached as **exhibit 18** and SXSW's Traffic Control Plan, attached as **exhibit 13**.
[29] See APD Public Information Request Response re SXSW arrests for George District during SXSW festival for 2009-2014, attached as **exhibit 20**.
[30] See APD Public Information Request Response re SXSW arrests for George Sector during SXSW festival for 2009-2014, attached as **exhibit 20**.

overall arrests for excessive alcohol consumption made citywide during the week of SXSW

occurred within the SXSW festival zone itself. Breaking the number down further, there were 21

arrests of drunk drivers within the George Sector during the 2014 weeklong festival. Twenty-one

drunk drivers within such a limited area and short time span is extraordinary. These arrest

statistics provide further compelling reasons for why the SXSW Defendants should have

anticipated—even expected—that an errant vehicle operated by an intoxicated person might

penetrate an area where SXSW encouraged pedestrians and bicyclists to congregate.

59. Similarly, SXSW should have known of the highly publicized drunk driving situation that

exists in Austin, particularly during the SXSW festival in the City's Central Business District

where most of the official SXSW bar venues are located. Because of the magnitude of alcohol

consumption in and around the festival, SXSW was on notice of an even higher degree of risk to

festivalgoers congregating in the street adjacent to SXSW venues. There is simply no legitimate

reason for SXSW not to have recognized that in planning a festival held largely in bars scattered

throughout the Central Business District, that many festival attendees would become intoxicated

and that some would drive through the area to go home or drive to other festival related events.

60. SXSW also should have known that drivers under the influence of alcohol pose a risk of

harm to festivalgoers who are congregating in and around the festival venues as well as entering

and exiting the festival venue zones because driving while intoxicated often results in crashes

that cause serious injury and death.

**D.** **Other factors should have compelled SXSW to guard against errant vehicles.**

**1.** **SXSW knew that festivalgoers would use bicycles to get around the festival.**

61. SXSW and its planners and organizers had all the more reason to be concerned about

serious injury or deaths from errant motor vehicles because SXSW knew festival attendees

would be pedestrians or on bicycles. In fact, SXSW encouraged festivalgoers and other pedestrians to occupy the roadway when it was closed in and around SXSW venues.

62. SXSW also encouraged festivalgoers to use alternative transportation during the 2014 SXSW music festival, including specifically bicycles, for traveling from one official SXSW venue to the next and to and from their SXSW-designated hotels. SXSW even provided a limited number of complimentary bicycles to festivalgoers and directed other patrons to use another Austin bicycle rental service for travelling to and from the many official SXSW bar venues. SXSW provided bicycle parking facilities at its various official venues because it expected large numbers of attendees to utilize bicycles. In addition, SXSW advertised that it would supplement existing bicycle parking at many SXSW venues on downtown streets to encourage bicycle use.[31] Finally, SXSW had 27 years of experience holding the festival and knew from past experience that thousands of festivalgoers utilized bicycles to hop from one venue to another and to and from their hotels.

### 2. SXSW had superior knowledge of the risk posed by errant vehicle collisions.

63. SXSW's 27 years of experience planning and organizing this music festival in an urban Austin setting gave SXSW and its planners and organizers superior knowledge of the risk that an errant vehicle could penetrate those streets it closed to traffic for SXSW events. Similarly, this experience gave SXSW superior knowledge that festival attendees congregating in the sections of the streets SXSW chose to close to traffic could sustain serious bodily injury or death if an errant vehicle intruded into the area. SXSW retained a traffic planning consultant to design a traffic control plan to address this risk. Patrick Lowe and the consulting firm that he owns and

---

[31] See screen shot of SXSW Web website regarding bicycles, attached as **exhibit 21**.

*Lizzy Plug, et al. v. SXSW, et al.*, **Plaintiffs' Original Complaint**

operates, Traffic Design Consultants, were traffic control consultants engaged by SXSW to obtain the Right-of-Way permits SXSW used to occupy and control the premises in the Central Business District where it held the music festival. Patrick Lowe and Traffic Design Consultants were SXSW's agents in planning and organizing the street closures for the music festival.[32] SXSW had control over how Patrick Lowe and Traffic Design Consultants performed their job because he and his company were SXSW's agents.

64. The science of traffic control is the science of managing traffic around people. This includes safety planning for special events such as a music festival held in the streets while live lanes of traffic surround and crisscross the festival area. SXSW had 27 years of experience operating this festival; prior errant vehicle collisions throughout the United States and in Austin were widely reported; extensive materials were available that provided guidelines and established standards for preventing errant vehicle collisions with pedestrians at special events; and SXSW engaged a traffic control consultant whose principal responsibility is to safely manage traffic around events with large crowds of pedestrians and bicyclists. Considered together, these factors gave the SXSW Defendants superior knowledge of the risk that errant vehicles posed to festival attendees. The SXSW Defendant's superior knowledge of the risk made the 2014 SXSW crash foreseeable, and therefore a preventable tragedy.

65. If SXSW determined that it could not ensure the safety of the thousands of pedestrians and bicyclists who it invited to congregate in the Central Business District to attend festival events, it should not have negligently closed streets utilizing inadequate traffic control measures; rather, it should have held the festival in a safe alternate location or implemented adequate traffic

---

[32] See Right-of-Way Permit Application, attached as **exhibit 18**.

*Lizzy Plug, et al. v. SXSW, et al.*, **Plaintiffs' Original Complaint**

control measures utilizing rigid barricades designed to protect festivalgoers on foot and on

bicycle from errant vehicles.

### 3. It would not have been onerous for SXSW to secure festival areas from errant vehicular traffic.

66. It would not have been onerous for SXSW to create secure areas free from vehicular

traffic. In fact, SXSW utilized the very types of rigid barricades that would have prevented this

tragedy on nearby streets to channel traffic into a designated parking garage.[33] The Traffic

Control Plan designated these types of barriers to create a traffic queue into the Empire Garage

on East 7th Street, two blocks away from the section of Red River Street where the SXSW

tragedy occurred. Had SXSW utilized these same barriers to close access to Red River Street at

9th Street and at 10th Street, the collision that claimed Steven Craenmehr's life and those of

several others would not have occurred. SXSW could have easily used safe and effective rigid

barricades that were sufficient in number for *de minimus* cost to ensure that its festival attendees

on Red River Street were protected from errant vehicular traffic.

67. SXSW knew that its festival brought over 375,000 people into the center of Austin.

SXSW encouraged festivalgoers to walk or use bicycles to navigate the downtown area while

traveling from one venue to another or to and from their hotels. Given the tens of millions of

dollars in revenue generated each year for the for-profit companies that own and operate the

SXSW festival, it would not have been burdensome for SXSW to establish dedicated lanes for

pedestrians and bicyclists throughout the Central Business District. These lanes, utilizing rigid

barricades, would effectively separate vehicles from pedestrians and bicyclists, keeping them

safe from vehicular collisions, serious injury and death. A network of such lanes created by

_____

[33] See SXSW's Traffic Control Plan, attached as **exhibit 13**.

*Lizzy Plug, et al. v. SXSW, et al.*, **Plaintiffs' Original Complaint**

interlocking rigid barricades that can be filled with water would provide secure and reliable

channels for the hundreds of thousands of festivalgoers to safely navigate the downtown area

while motor vehicles crisscross the same areas.

### 4. SXSW's Right-of-Way permit gave SXSW legal possession and control of the street where the crash occurred.

68. SXSW began the process of procuring Right-of-Way permits to host the 2014 festival by

engaging an agent to submit its applications. SXSW retained Traffic Design Consultants and its

principal Patrick Lowe as its agents to prepare and submit applications for Right-of-Way permits

designating the specific streets and blocks SXSW wanted to possess and control in order to host

its 2014 festival and set up venues.[34] Notwithstanding the size and magnitude of the festival, the

Texas Board of Professional Engineers website shows no record that a Patrick Lowe is a licensed

traffic engineer, or a licensed engineer of any kind for that matter, by the State of Texas.[35]

69. To justify the Right-of-Way permit that Defendant Lowe and Defendant Traffic Design

Consultants submitted for SXSW for the various street closures, Lowe under-estimated the

number of SXSW festival attendees as 40,000. In actuality, SXSW anticipated selling, and in fact

did sell, well over 40,00 credentials and knew that attendance would be far in excess of this

number.[36] Moreover, the SXSW Defendants made the knowingly false statement on its Right-of-

Way permit application that no alcoholic beverages would be *sold or consumed* within the closed

off area.

70. The Right-of-Way permit application submitted by Defendant Lowe on behalf of SXSW

requested Right-of-Way permits for multiple streets including Red River Street between 8th

---

[34] See Application for Right-of-Way permit, attached as **exhibit 18**.
[35] See screenshot of the Texas Board of Professional Engineers website, attached as **exhibit 22**.
[36] See Application for Right-of-Way permit, attached as **exhibit 18**.

Street and 11th Street. The City of Austin approved the application and issued the Right-of-Way permit for the requested street closures giving SXSW the right to occupy and control the premises including the 900 block and 1000 block of Red River Street.[37] Thus, SXSW anticipated that its invitees would utilize that section of Red River to attend the venues where the SXSW bands performed.

71. The Right-of-Way permit further required that the applicant submit a Traffic Control Plan that conformed to the Texas Manual on Uniform Traffic Control Devices as well as the City of Austin Transportation Criteria Manual or the 804 Series Standard Details.

72. In the early morning hours of March 13, 2014, SXSW was the possessor and in control of the premises between 9th Street and 11th Street on Red River pursuant to the Right-of-Way permit for this section of the Central Business District. SXSW created a festival zone in front of the four official SXSW venues in that section of Red River Street: the indoor and outdoor Cheer Up Charlie's venues and the indoor and outdoor Mohawk venues.

**E.  The City of Austin's 2014 Post-Event Evaluation.**

73. The City of Austin Post-Evaluation Report includes examples of major safety and traffic control concerns that have been pervasive throughout the last several years at the SXSW festival. In fact, the City of Austin characterizes the traffic and safety situation as "critical."[38] The Post-Event Evaluation Report goes on to state that "crowd management is worsening," and calls for major changes to address public safety concerns.

74. The Post-Evaluation Report cites several concerns that should have been obvious to SXSW such as: overcrowding, inadequate staffing, alcohol consumption (alcohol is sometimes

---

[37] See Right-of-Way permit, attached as **exhibit 23**.
[38] See Post-Event Evaluation Report, attached as **exhibit 4**.

*Lizzy Plug, et al. v. SXSW, et al.*, Plaintiffs' Original Complaint

provided to patrons for free), and negligent traffic control planning and implementation. With respect to this last point, the Post-Evaluation Report specifically cites to several contributing factors including: late changes to SXSW's Traffic Control Plan, the failure to implement approved changes to the Traffic Control Plan, SXSW's failure to communicate changes to the Traffic Control Plan to its staff and barricade providers, and improper installation of barricades.[39] This report reveals a mere sample of the extent of SXSW's negligence, indeed incompetence, in planning, implementing and maintaining a traffic control plan sufficient to provide for the safety of festivalgoers given the scope and complexity of the SXSW festival.

### F. Steven Craenmehr's Life



75. Steven was born on February 23, 1979 in Rotterdam, Netherlands. He spent his childhood in Putten, Arnhem and Heerenveen and he was the eldest of three sons. Steven and his two

---

[39] See Post-Event Evaluation Report at pp. 8-9, attached as **exhibit 4**.

younger brothers Sjoerd and Gijs, were inseparable. The brotherly bond between Steven and his brothers had always been strong but was cemented when they lost their father to cancer in 1992. Steven's mother was only 39 and Steven was just 13; his younger brothers were 11 and 7. As the eldest boy, Steven felt responsible for taking care of his mother and his young brothers. Steven assumed his role as the eldest son and oldest brother in his family with virtue, patience, positivity and complete selflessness. He became the protector and cornerstone of his heartbroken family in the aftermath of his father's premature death from cancer.

76. Even at his young age, Steven united his mother and brothers as one front to continue life without their father and husband. Both younger brothers wanted to remain close to Steven, even as adults, and followed Steven, first to his university in Utrecht, and then to Amsterdam.

77. Steven had an immense love for sport. In his younger years, Steven was a particularly promising tennis player and played soccer and hockey at highly competitive levels. But it didn't matter if he was playing or his brothers were playing and he was watching from the sidelines— he gave it his all. Week after week, come rain or shine, Steven would attend Gijs' hockey games to encourage, coach and cheer his younger brother from the sidelines, full of pride.

78. Steven and Lizzy fell in love on the day they met in 2000 while on holiday when Steven was 21 and Lizzy 19. In 2003, they became husband and wife and began to build a life together. On July 14, 2014, Steven and Lizzy would have celebrated their 14th anniversary of being together. Steven was a relentlessly happy individual in love with life; he lived for his wife and son and his family and friends.

79. Steven's son M.C. was born on June 13, 2012. His birth was stressful and complicated, and he was eight weeks premature. M.C. remained in the hospital for five weeks after his birth. Going to the hospital every day for weeks not knowing whether her and Steven's son would

survive caused Lizzy to suffer immensely, both physically and psychologically, and it eventually became evident that Lizzy was suffering from postpartum depression. Steven never wavered. He stood behind Lizzy every single terrible moment during that period, even while somehow continuing to work over 40 hour weeks. He was Lizzy's rock; the person she could rely on; the person she held onto to survive. Steven carried and cradled his new family back to life. Steven and Lizzy had finally established a sense of peace in their lives following M.C.'s difficult birth and Lizzy's post natal health issues.  Lizzy was healthy, M.C. was thriving and they no longer lived in fear and anxiety.[40] Steven and Lizzy were planning their second child when Steven left Amsterdam on business to attend the 2014 SXSW Music Festival in Austin, Texas.

80. The immense impact Steven had on the world became even more evident after his passing, when Lizzy asked Steven's family and friends to write letters to M.C. to tell him about his father. Following the ceremony, the family's mailbox overflowed with letters for M.C. in memory of Steven. Every letter described Steven's everlasting enthusiasm, his motivation, his positive outlook on life, his sincerity and honesty, his happiness and his passion for life. His passing has left a void of enormous proportions in Lizzy's life, M.C.'s life, his mother Lidy's life and his younger brothers' lives, Sjoerd and Gijs.

81. Music was Steven's greatest passion after the love for his family. His trip to Austin for SXSW was, as he was often heard to say, "to change the world through sound". He came to SXSW to be inspired, to scout new talent and to expand and cultivate his business network within the music industry. Steven loved his work.

--------

[40] See pictures of Steven, Lizzy, and M.C., attached as **exhibit 24**.

82. In 2006, Steven landed his dream job in the Amsterdam office of Massive Music and Steven and Lizzy relocated to the city. Steven started out in sales and was quickly promoted to producer in the newly established Sonic Branding division of Massive Music. Steven was so talented and highly regarded by the agency's clients that he was named Creative Director of the Sonic Branding Division of the international music talent agency after only three years as a producer. The Sonic Branding division became Massive Music's fastest growing division, accounting for a disproportionately large share of the company's revenues. Sonic Branding is the division responsible for developing a music soundtrack to identify a brand—think the Heineken commercial where the sharp dressed man dances his way through night clubs from one partner to the next as he navigated his way towards a bottle of Heineken. Steven and his colleagues created and developed the soundtrack for clients such as Heineken and KLM. Steven loved the creative process and collaborating with clients and colleagues. Steven had worked at Massive Music for eight years and was poised for a promising future. His reputation was growing along with his income and his long-term earning potential was unlimited; in a few more years, he would have been able to establish his own agency.

83. As part of his professional responsibilities for Massive Music, Steven traveled to SXSW to scout new music talent and to network with other music industry professionals. It was for this business purpose that Steven paid for SXSW festival credentials and traveled across the Atlantic from the Netherlands to attend SXSW in Austin.[41] And it was for this specific reason that Steven attended the SXSW showcase held on Red River Street on the night of March 12 and early

---

[41] See Steven's emailed receipt for SXSW credentials, attached as **exhibit 25**.

morning of March 13, 2014, leading him onto the premises under the possession and control of the SXSW Defendants.

### G.  The events of the early morning hours of March 13, 2014

84. As Steven and his colleague and friend Michiel Cremers were leaving the SXSW showcase held on Red River Street to return to the ATT Conference Center Hotel at 19th Street where they were both staying at SXSW's recommendation, Austin Police Officer Traylor observed a small sedan make an illegal left turn from the right lane of west bound 12th Street onto the southbound I-35 access road, cutting off Officer Traylor in the process. Officer Traylor flipped on his emergency lights to pull the driver over. As Officer Traylor approached the car, the driver drove away and maneuvered through a parking lot onto 9th Street heading west. Officer Traylor hurried back into his patrol car to give chase. As the driver approached the corner of 9th Street and Red River, he turned to the right, heading north and easily penetrated the area where SXSW festivalgoers were congregating on Red River Street for the SXSW showcases being held there. With Officer Traylor in pursuit, the errant vehicle continued to advance north as it collided with multiple pedestrians. The vehicle breached the perimeter at the opposite end of the block of Red River at 10th Street and continued north into the 1000 block of Red River towards 11th Street.

85. At the same moment, Michiel reach down to make an adjustment on his bicycle and then next thing he knew, his friend was dead on the pavement.

86. It was morning in Amsterdam when Michiel called home to deliver the devastating news of Steven's death. Lizzy and Lidy learned of the tragic news shortly thereafter.  It took nearly two weeks for Lizzy, Lidy and Steven's younger brothers to arrange to transport Steven's body back to the Netherlands for burial.

87. The errant vehicle collision that claimed Steven Craenmehr's life was a preventable tragedy that the SXSW Defendants should have anticipated and guarded against. Had they done so, Steven would be alive today.

## V.   CAUSES OF ACTION

### Count 1. Negligence by the SXSW Defendants

88. Plaintiffs incorporate by reference all of the allegations contained in the foregoing paragraphs as if they were fully restated in Count 1.

1. **Duty - The SXSW Defendants owed Steven Craenmehr a duty to exercise reasonable care to avoid a foreseeable risk.**

    a. *The risk was an errant vehicle.*

89. A special event such as the music festival planned and organized by SXSW, Patrick Lowe, and Traffic Design Consultants (hereinafter "SXSW Defendants") that was to take place in the middle of an urban central business district surrounded and crisscrossed by live traffic was vulnerable to the risk posed by an errant vehicle. The risk was that an errant vehicle would penetrate the perimeter of the festival zone that had been cordoned off for pedestrians and cyclists. Any collision between an errant vehicle and a pedestrian or bicyclist is likely to result in serious injury or death to the pedestrian or bicyclist.

    b. *The risk of an errant vehicle was foreseeable.*

90. Foreseeability of a danger does not require that the exact sequence of events that produced the harm be predicted. Travis v. City of Mesquite, 830 S.W.2d 94, 98 (Tex. 1992); Mellon Mortgage Co. v. Holder, 5 S.W3d 654, 655 (Tex. 1999). It simply requires that the general danger be foreseeable. The general danger of an errant vehicle penetrating the perimeter of the festival zone and colliding with and injuring or killing festivalgoers was or should have been foreseeable to the SXSW Defendants. Defendants knew or should have known that the risk

of an errant vehicle incident was foreseeable because there are approximately 20,000 errant vehicle incidents in the United States every year. In recent years, several high profile incidents involving errant vehicles penetrating pedestrian and bicycle areas—such as the 2003 Santa Monica Farmer's Market crash, the 2012 Austin Hike and Bike Trail, and the 2013 Venice Beach boardwalk crash—have resulted in serious injuries and deaths. These previous errant vehicle incidents made the incident of March 13, 2014 at the SXSW festival readily foreseeable.

91. Moreover, SXSW expected and encouraged attendees to travel throughout Austin's Central Business District as pedestrians and on bicycles and SXSW purposefully designed the festival so that pedestrians and attendees on bicycles were forced to congregate in and travel through areas immediately bordered by live lanes of traffic. In fact, this was an aspect of the festival that SXSW boasted was unique.

92. SXSW recognized the risk posed by traffic and took steps—albeit negligent and inadequate steps—to close streets to traffic in light of that risk using simple signage.

93. Furthermore, public intoxication and driving while intoxicated in Austin's Central Business District during the SXSW festival is a well documented fact through both the elevated number of arrests each year during the festival and because of the media's coverage of the issue. Thus the general danger to a festivalgoer such as and including Steven Craenmehr from an errant vehicle driven by an intoxicated person was also foreseeable.

94. Similarly, the general danger of serious bodily injury or death from an errant vehicle to a festivalgoer such as and including Steven Craenmehr in and around the SXSW festival was foreseeable to the SXSW Defendants. Similarly, the general danger to Steven Craenmehr from an errant vehicle driven by an intoxicated person in and around the SXSW festival was foreseeable.

95. The general character of the injury could be reasonably anticipated by the SXSW Defendants in light of the serious injuries and deaths that resulted from similar prior incidents including the Santa Monica Farmer's Market crash, the Venice Beach Boardwalk crash, and the Austin Hike and Bike Trail collision. Each of these incidents caused serious bodily injuries and deaths from the impact of a moving motor vehicle colliding with pedestrians and cyclists. Because foreseeability of a danger does not require that the exact sequence of events that produced the harm be predicted, the widespread and recurring incidents of errant vehicle crashes nationally, the high profile nature of some of them such as the Santa Monica Farmer's Market crash that killed 10 and injured 63—18 seriously, and the serious injury and death that occurred as a result of an errant vehicle crash that occurred on the Austin Hike and Bike Trail a mere two years before the 2014 SXSW crash all make the danger of an errant vehicle intruding into closed streets hosting the SXSW festival a foreseeable and predictable event.

96. Finally, where the injured person is situated close to the wrongful act, his or her injury is all the more foreseeable. Steven Craenmehr was a festivalgoer who was injured less than 100 meters from where the SXSW Defendants failed to deploy rigid barriers that would have prevented the errant vehicle from penetrating the perimeter of the festival zone at Red River Street and 9th Street.

### c. The risk of an errant vehicle posed a likelihood of injury.

97. The likelihood of serious injury or death resulting from a collision between a moving vehicle and a pedestrian or cyclist is self evident. In addition, the reality that serious injury and death will result from an errant vehicle incident is well documented and publicized. The 18 serious injuries and 10 deaths that occurred as a result of the 2003 Santa Monica Farmer's Market Crash and the serious injuries to one individual and the death of another individual as a

33

*Lizzy Plug, et al. v. SXSW, et al.*, **Plaintiffs' Original Complaint**

result of the 2012 Austin Hike and Bike Trail errant vehicle collision underscore the likelihood

that injuries and deaths, including Steven Craenmehr's, would occur as a result of the errant

vehicle collision with pedestrians and cyclists on March 13, 2014 at the SXSW Festival on Red

River Street between 9th and 11th streets.

> ### d. The SXSW Defendants possessed superior knowledge of the risk of an errant vehicle.

98. The SXSW Defendants had superior knowledge of the risk and general danger posed to

festivalgoers such as and including Steven Craenmehr from errant vehicle collisions because

they are festival promoters with 27 years' experience in holding a music festival in the urban,

downtown Austin environment and they are traffic design consultants who's professional

occupation is to plan and manage traffic around crowds in such an environment.

> ### e. The Risk-Utility Test factors weigh in favor of placing a duty to act with reasonable care on the SXSW Defendants.

99. Defendants are in the best position—or at the least were in a better position than festival

attendees such as and including Steven Craenmehr—to ensure that proper traffic control

measures were deployed to protect pedestrians and bicyclists who were SXSW festival attendees

such as Steven Craenmehr because the duty is more easily and reasonably borne by the SXSW

Defendants. The consequences of placing the duty to take steps to protect pedestrians and

cyclists attending the SXSW festival would simply require Defendants to deploy adequate traffic

control measures and the practical reality and the financial cost of doing so is *de minimus* given

the tens of millions of dollars in revenue that the festival generates each year for SXSW and its

owners. Proper traffic control measures to separate moving vehicles from pedestrians, including

rigid barriers are so widely available and used throughout Austin's Central Business District that

they are a ubiquitous site at virtually every temporary street closure for construction in the

Central Business District. In fact, the SXSW Defendants were aware of the existence of and had access to water-filled rigid barriers because such barriers were used as a traffic control measure on 7th Street to channel traffic into a garage. Proper traffic control measures would have been easily set up and taken down, even in an emergency situation. Water-filled rigid barriers can be sufficiently drained and moved by one person in less than one minute to allow for access of emergency vehicles. Moreover, a hand-operated pallet jack operator could be assigned at a *de minimus* cost to key intersections or access points where the need for such access is anticipated because of the proximity to a hospital or firehouse or emergency medical station.

## 2. Breach - The SXSW Defendants breached their duty to Steven Craenmehr.

100.     The SXSW Defendants failed to utilize adequate traffic control measures to protect attendees who were pedestrians or bicyclists. Ordinary, prudent festival organizers and ordinary, prudent traffic design consultants would have deployed rigid barricades to prevent errant vehicles from colliding with festival attendees. In addition, Defendants failed to follow the highest standard of care. Very cautious and prudent festival organizers and traffic design consultants would have deployed rigid barricades to prevent errant vehicles from colliding with festival attendees.

101.     Because he SXSW Defendants failed to exercise the care of an ordinarily prudent festival organizer and of an ordinarily prudent traffic design consultant or that of a very cautious and prudent festival organizer or of a very cautious and prudent traffic design consultant the SXSW Defendants breached the duty they owed SXSW festival attendees such as and including Steven Craenmehr.

### 3. Proximate Cause - The SXSW Defendants' failure to exercise ordinary care proximately caused Steven Craenmehr's death.

#### a. The SXSW Defendants' failure to exercise ordinary care to prevent an errant vehicle collision was a substantial factor in causing Steven Craenmehr's death.

102.     The inadequate traffic control measures deployed by the SXSW Defendants were a substantial factor in bringing about Steven Craenmehr's serious injuries and death because the use of proper traffic control measures, such as but not limited to rigid barriers, would have prevented an errant vehicle from penetrating the area closed at Red River and 9th Street.  Had an errant vehicle not been able to so easily penetrate the SXSW festival venue on Red River Street between 9th and 11th Streets, an errant vehicle would not have collided with Steven Craenmehr, and Steven Craenmehr would not have died from the impact.

#### b. But for the SXSW Defendants' failure to exercise ordinary care, Steven Craenmehr would not have been killed by an errant vehicle.

103.     But for the SXSW Defendants' failure to exercise ordinary care by deploying adequate traffic control measures to keep traffic out of the festival venue on Red River Street between 9th and 11th Streets, an errant vehicle would not have been able to penetrate the venue space at 9th and Red River Street, nor would an errant vehicle have been able to progress past 10th Street on Red River Street if proper measures had been deployed at that intersection.  But for the SXSW Defendants to utilize and deploy appropriate traffic control measures, Steven Craenmehr would not have been seriously injured and killed.

#### c. An errant vehicle collision on Red River during SXSW was foreseeable.

104.     A collision between an errant vehicle and pedestrians and bicyclists in and around the SXSW festival venue located in the middle of a city block inside the Central Business

District while live lanes of traffic were active around and through the venue was foreseeable to the SXSW Defendants.

105.    A festival organizer and a traffic design consultant of ordinary intelligence would have anticipated the danger created by inadequate traffic control measures posed by errant vehicles, including errant vehicles operated by intoxicated persons.

106.    Defendants knew or should have known that the risk of an errant vehicle incident was foreseeable because there are approximately 20,000 errant vehicle incidents in the United States every year. In recent years, several high profile incidents involving errant vehicles penetrating pedestrian and bicycle areas—such as the 2003 Santa Monica Farmer's Market crash, the 2012 Austin Hike and Bike Trail, and the 2013 Venice Beach boardwalk crash—have resulted in serious injuries and deaths. These previous errant vehicle incidents made the incident of March 13, 2014 at the SXSW festival readily foreseeable.

107.    Moreover, SXSW expected and encouraged attendees to travel throughout Austin's Central Business District as pedestrians and on bicycles and SXSW purposefully designed the festival so that pedestrians and attendees on bicycles were forced to congregate in and travel through areas immediately bordered by live lanes of traffic. In fact, this was an aspect of the festival that SXSW boasted was unique. SXSW recognized the risk posed by traffic and took steps—albeit negligent and inadequate steps—to close streets to traffic in light of that risk using simple signage.

108.    Furthermore, public intoxication and driving while intoxicated in Austin's Central Business District during the SXSW festival is a well documented fact through both the elevated number of arrests each year during the festival and because of the media's coverage of the issue.

Thus the general danger to a festivalgoer such as and including Steven Craenmehr from an errant vehicle driven by an intoxicated person was also foreseeable.

109.     Similarly, the general danger of serious bodily injury or death from an errant vehicle to a festivalgoer such as and including Steven Craenmehr in and around the SXSW festival was foreseeable to the SXSW Defendants. Similarly, the general danger to Steven Craenmehr from an errant vehicle driven by an intoxicated person in and around the SXSW festival was foreseeable.

110.     The general character of the injury could be reasonably anticipated by the SXSW Defendants in light of the serious injuries and deaths that resulted from similar prior incidents including the Santa Monica Farmer's Market crash, the Venice Beach Boardwalk crash, and the Austin Hike and Bike Trail collision. Each of these incidents caused serious bodily injuries and deaths from the impact of a moving motor vehicle colliding with pedestrians and cyclists. Because foreseeability of a danger does not require that the exact sequence of events that produced the harm be predicted, the widespread and recurring incidents of errant vehicle crashes nationally, the high profile nature of some of them such as the Santa Monica Farmer's Market crash that killed 10 and injured 63—18 seriously, and the serious injury and death that occurred as a result of an errant vehicle crash in Austin on the Hike and Bike Trail in the Central Business District a mere two years before the 2014 SXSW crash all make the danger that an errant vehicle might penetrate the perimeter of  closed street hosting part of the SXSW festival a foreseeable and predictable event.

111.     Steven Craenmehr was a festivalgoer who was injured less than 100 meters from where the SXSW Defendants failed to deploy rigid barriers that would have prevented the errant

38

vehicle from penetrating the perimeter of Red River Street at 9th Street, proceeding north on Red River, and colliding with Steven Craenmehr.

112.     Because Steven Craenmehr's death was foreseeable and the SXSW Defendants' negligence was a substantial factor in Steven Craenmehr's death and but for their negligence he would not have died, the SXSW defendants are liable in negligence for the damages to Plaintiffs.

### 4.  Gross Negligence – The SXSW Defendants were grossly negligent.

113.     The SXSW Defendants' decision to deploy inadequate traffic control measures involved an extreme degree of risk given the foreseeability and probability of an errant vehicle incident and the magnitude of potential harm from such an incident.

114.     Defendants had actual awareness of the risk of a collision between an errant vehicle and a pedestrian or bicycling attendee but nonetheless proceeded with conscious indifference to the safety and welfare of the festival attendees. Defendants had actual awareness that such a collision would result in serious bodily injury or death.

### 5.  Joint and Several Liability of the SXSW Defendants

115.     At all material times the SXSW Defendants were agents, servants, employees, partners, authorized agents and/or joint venturers of one another and the acts of each SXSW Defendant were within the course and scope of the agency, employment, partnership, and/or joint venture such that each SXSW Defendant is jointly and severally liable for the damages they collectively caused Plaintiffs.

116.     The allegations of Count 1 are likely to have greater evidentiary support after a reasonable opportunity for further investigation and discovery.

**Count 2. Negligence Per Se by the SXSW Defendants**

117.        Plaintiffs incorporate by reference all of the allegations contained in the foregoing

paragraphs as if they were fully restated in Count 2.

**1.    The City of Austin Ordinance governing temporary street closures for festivals was designed to protect Steven Craenmehr.**

118.        City of Austin Ordinance 14-8-4, Temporary Closure for a Right-of-Way Events,

requires applicants for events that will close streets to comply with applicable rules. [42]

Defendants' Right-of-Way permit issued under the Ordinance required compliance with state,

local, and industry standards. Steven Craenmehr was among the 40,000 participants for whom

the application for the right-or-way permit was requested by Defendants. Thus, Steven

Craenmehr belonged in the class of persons for whom the Ordinance governing temporary street

closures for events was deigned to protect.

**2.    Tort liability may be imposed under the Ordinance governing temporary street closures for festivals.**

119.        Civil liability under City of Austin Ordinance 14-8-4, Temporary Closure for a

Right-of-Way Events, is consistent with Council's intent to require applicants for Right-of-Way

permits to conform to reasonable standards of care. In addition, the Ordinance requires

mandatory conduct. Finally, Defendants had no excuse for noncompliance with the Ordinance

given that Defendants had knowledge of the Ordinance and were capable of compliance.

---

[42] See City of Austin Ordinance 14-8-4, Temporary Closure for a Right-of-Way Events, attached as **exhibit 26**.

*Lizzy Plug, et al. v. SXSW, et al.*, **Plaintiffs' Original Complaint**

### 3. The SXSW Defendants' violation of the Ordinance proximately caused Steven Craenmehr's death.

120.    The inadequate traffic control measures deployed by Defendants in violation of City of Austin Ordinance 14-8-4, Temporary Closure for a Right-of-Way Events, were a substantial factor in bringing about Steven Craenmehr's serious injuries and death. If Defendants' traffic control measures had been in compliance with City of Austin Ordinance 14-8-4, Temporary Closure for a Right-of-Way Events, Steven Craenmehr would not have been seriously injured and killed. But for the noncompliance with City of Austin Ordinance 14-8-4, Temporary Closure for a Right-of-Way Event, Steven Craenmehr would not have been seriously injured and killed.

121.    A festival organizer or traffic design consultant of ordinary intelligence would have anticipated the danger created by noncompliance with City of Austin Ordinance 14-8-4, Temporary Closure for a Right-of-Way Events. Defendants knew or should have known that the risk of an errant vehicle incident was foreseeable because there are approximately 20,000 errant vehicle incidents in the United States every year. In recent years, several high profile incidents involving errant vehicles penetrating pedestrian and bicycle areas—such as the 2003 Santa Monica Farmer's Market crash, the 2012 Austin Hike and Bike Trail, and the 2013 Venice Beach boardwalk crash—have resulted in serious injuries and deaths. These previous errant vehicle incidents made the incident of March 13, 2014 at the SXSW festival readily foreseeable.

122.    Moreover, SXSW expected and encouraged attendees to travel throughout Austin's Central Business District as pedestrians and on bicycles and SXSW purposefully designed the festival so that pedestrians and attendees on bicycles were forced to congregate in and travel through areas immediately bordered by live lanes of traffic. In fact, this was an aspect of the festival that SXSW boasted was unique.

123.    SXSW recognized the risk posed by traffic and took steps—albeit negligent and inadequate steps—to close streets to traffic in light of that risk using simple signage.

124.    Furthermore, public intoxication and driving while intoxicated in Austin's Central Business District during the SXSW festival is a well documented fact through both the elevated number of arrests each year during the festival and because of the media's coverage of the issue. Thus the general danger to a festivalgoer such as and including Steven Craenmehr from an errant vehicle driven by an intoxicated person was also foreseeable.

125.    Thus, the general danger of serious bodily injury or death from an errant vehicle to a festivalgoer such as and including Steven Craenmehr in and around the SXSW festival was foreseeable to the SXSW Defendants. Similarly, the general danger to Steven Craenmehr from an errant vehicle driven by an intoxicated person in and around the SXSW festival was foreseeable.

126.    The general character of the injury could be reasonably anticipated by the SXSW Defendants in light of the serious injuries and deaths that resulted from similar prior incidents including the Santa Monica Farmer's Market crash, the Venice Beach Boardwalk crash, and the Austin Hike and Bike Trail collision. Each of these incidents caused serious bodily injuries and deaths from the impact of a moving motor vehicle colliding with pedestrians and cyclists. Because foreseeability of a danger does not require that the exact sequence of events that produced the harm be predicted, the widespread and recurring incidents of errant vehicle crashes nationally, the high profile nature of some of them such as the Santa Monica Farmer's Market crash that killed 10 and injured 63—18 seriously, and the serious injury and death that occurred as a result of an errant vehicle crash in Austin on the Hike and Bike Trail in the Central Business District a mere two years before the 2014 SXSW crash all make the danger that an errant vehicle

*Lizzy Plug, et al. v. SXSW, et al.*, **Plaintiffs' Original Complaint**

might penetrate the perimeter of closed street hosting part of the SXSW festival a foreseeable and predictable event.

**4. Gross Negligence - The SXSW Defendants were grossly negligent.**

127. The SXSW Defendants' decision to deploy inadequate traffic control measures involved an extreme degree of risk given the foreseeability and probability of an errant vehicle incident and the magnitude of potential harm from such an incident.

128. Defendants had actual awareness of the risk of a collision between an errant vehicle and a pedestrian or bicycling attendee but nonetheless proceeded with conscious indifference to the safety and welfare of the festival attendees. Defendants had actual awareness that such a collision would result in serious bodily injury or death.

**5. Joint and Several Liability of the SXSW Defendants**

129. At all material times the SXSW Defendants were agents, servants, employees, partners, authorized agents and/or joint venturers of one another and the acts of each SXSW Defendant were within the course and scope of the agency, employment, partnership, and/or joint venture such that each SXSW Defendant is jointly and severally liable for the damages they collectively caused Plaintiffs.

130. The allegations of Count 2 are likely to have greater evidentiary support after a reasonable opportunity for further investigation and discovery.

**Count 3. Negligent Voluntary Undertaking by the SXSW Defendants**

131. Plaintiffs incorporate by reference all of the allegations contained in the foregoing paragraphs as if they were fully restated in Count 3.

**1.  The SXSW Defendants owed a legal duty to Steven Craenmehr.**

132.      Defendants voluntarily undertook to provide a service that they knew or should have known was necessary for the public's protection. Defendants voluntarily applied for street closures to protect festival attendees from traffic. Defendants knew or should have known that proper deployment of adequate traffic control measures was necessary in order to protect the 40,000 attendees including Steven Craenmehr because it was foreseeable that an errant vehicle incident could happen.

133.      Defendants knew or should have known that the risk of an errant vehicle incident was foreseeable because there are approximately 20,000 errant vehicle incidents in the United States every year. In recent years, several high profile incidents involving errant vehicles penetrating pedestrian and bicycle areas—such as the 2003 Santa Monica Farmer's Market crash, the 2012 Austin Hike and Bike Trail, and the 2013 Venice Beach boardwalk crash—have resulted in serious injuries and deaths. These previous errant vehicle incidents made the incident of March 13, 2014 at the SXSW festival readily foreseeable.

134.      Moreover, SXSW expected and encouraged attendees to travel throughout Austin's Central Business District as pedestrians and on bicycles and SXSW purposefully designed the festival so that pedestrians and attendees on bicycles were forced to congregate in areas immediately bordered by live lanes of traffic. In fact, this was an aspect of the festival that SXSW boasted was unique.

135.      SXSW recognized the risk posed by traffic and took steps—albeit negligent and inadequate steps—to close streets to traffic in light of that risk using simple signage.

136.      Furthermore, public intoxication and driving while intoxicated in Austin's Central Business District during the SXSW festival is a well documented fact through both the elevated

44

number of arrests each year during the festival and because of the media's coverage of the issue. Thus the general danger to a festivalgoer such as and including Steven Craenmehr from an errant vehicle driven by an intoxicated person was also foreseeable.

137.    Thus, the general danger of serious bodily injury or death from an errant vehicle to a festivalgoer such as and including Steven Craenmehr in and around the SXSW festival was foreseeable to the SXSW Defendants. Similarly, the general danger to Steven Craenmehr from an errant vehicle driven by an intoxicated person in and around the SXSW festival was foreseeable.

138.    The general character of the injury could be reasonably anticipated by the SXSW Defendants in light of the serious injuries and deaths that resulted from similar prior incidents including the Santa Monica Farmer's Market crash, the Venice Beach Boardwalk crash, and the Austin Hike and Bike Trail collision. Each of these incidents caused serious bodily injuries and deaths from the impact of a moving motor vehicle colliding with pedestrians and cyclists. Because foreseeability of a danger does not require that the exact sequence of events that produced the harm be predicted, the widespread and recurring incidents of errant vehicle crashes nationally, the high profile nature of some of them such as the Santa Monica Farmer's Market crash that killed 10 and injured 63—18 seriously, and the serious injury and death that occurred as a result of an errant vehicle crash in Austin on the Hike and Bike Trail in the Central Business District a mere two years before the 2014 SXSW crash all make the danger that an errant vehicle might penetrate the perimeter of a closed street hosting part of the SXSW festival a foreseeable and predictable event.

**2.    The SXSW Defendants breached their legal duty to Steven Craenmehr.**

139.    Defendants failed to utilize adequate traffic control measures to protect pedestrians and attendees on bicycles from errant vehicles. Ordinary, prudent festival organizers and ordinary, prudent traffic design consultants would have deployed rigid barricades to prevent errant vehicles from colliding with festival attendees.

**3.    The SXSW Defendants' negligent performance of their voluntary undertaking increased Steven Craenmehr's risk of harm.**

140.    Defendants' negligent performance of their voluntary undertaking to close streets increased Steven Craenmehr's risk of harm because it made him less likely to expect and ride his bicycle defensively for a vehicle coming from the cordoned-off streets.

**4.    Steven Craenmehr relied on the SXSW Defendants' traffic control measures.**

141.    Like any ordinary and reasonable festival attendee, Steven Craenmehr relied on Defendants' performance of their voluntary undertaking to close streets for his safety while attending the festival. Like any ordinary and reasonable festival attendee, Steven Craenmehr assumed that having applied to close streets and received the proper Right-of-Way permits, Defendants' would adequately deploy traffic control measures to deter errant vehicles and protect festival attendees.

**5.    The SXSW Defendants' negligence proximately caused Steven Craenmehr's death.**

142.    The SXSW Defendants' negligence in adopting inadequate traffic control measures to close the streets to protect festival attendees from traffic was a substantial factor that caused Steven Craenmehr's death because but for the inadequate traffic control measures the SXSW Defendants used to close Red River Street between 9th and 11th Streets, an errant vehicle

would not have been able to penetrate the ostensibly closed section of Red River and collide with

Steven Craenmehr.

143.     The incursion of an errant vehicle, particularly one operated by an intoxicated

person, into the cordoned off section of Red River Street at 9th Street was a foreseeable event

because there are approximately 20,000 errant vehicle collisions annually. Moreover, there have

been numerous high profile errant vehicle collisions in and around sections of streets that are

temporarily closed for pedestrian events such as farmer's markets, including the 2003 Santa

Monica Farmer's Market collision that left 10 people dead and 18 seriously injured.  That errant

vehicle was not driven by an intoxicated person but was otherwise similar to the incident that

occurred on March 13, 2014 at the SXSW Music Festival on Red River Street between 9th and

11th Streets. Because of the high number of arrests for driving while intoxicated during SXSW

in the Central Business District each year, for at least the last five years preceding the 2014

SXSW Music Festival, SXSW knew or should have known of the risk that intoxicated persons

were operating motor vehicles in the immediate vicinity of the section of Red River that the

SXSW Defendants possessed and to where it invited pedestrians and bicyclists to congregate.

### 6.  Gross Negligence – The SXSW Defendants were grossly negligent.

144.     The SXSW Defendants' decision to deploy inadequate traffic control measures

involved an extreme degree of risk given the foreseeability and probability of an errant vehicle

incident and the magnitude of potential harm from such an incident.

145.     Defendants had actual awareness of the risk of a collision between an errant

vehicle and a pedestrian or bicycling attendee but nonetheless proceeded with conscious

indifference to the safety and welfare of the festival attendees. Defendants had actual awareness

that such a collision would result in serious bodily injury or death.

47

*Lizzy Plug, et al. v. SXSW, et al.*, **Plaintiffs' Original Complaint**

### 7. Joint and Several Liability of the SXSW Defendants

146.    At all material times the SXSW Defendants were agents, servants, employees, partners, authorized agents and/or joint venturers of one another and the acts of each SXSW Defendant were within the course and scope of the agency, employment, partnership, and/or joint venture such that each SXSW Defendant is jointly and severally liable for the damages they collectively caused Plaintiffs.

147.    The allegations of Count 3 are likely to have greater evidentiary support after a reasonable opportunity for further investigation and discovery.

### Count 4. Premises Liability of the SXSW Defendants

148.    Plaintiffs incorporate by reference all of the allegations contained in the foregoing paragraphs as if they were fully restated in Count 4.

### 1. The SXSW Defendants were the temporary occupiers of the premises.

149.    Defendants had a City of Austin Right-of-Way permit that made it the temporary legal occupier of Red River Street between 9th Street and 11th Street. Defendants' Right-of-Way permit gave them temporary legal control over Red River Street between 9th Street and 11th Street. Thus Defendants were the temporary occupiers of the premises encompassing Red River Street between 9th Street and 11th Street. As the temporary occupier of the premises SXSW owed Steven Craenmehr a duty of care to keep the premises in a reasonably safe condition.

### 2. Because Steven Craenmehr was an invitee of SXSW, the SXSW Defendants owed him the highest duty of care.

150.    Steven Craenmehr entered the premises on Red River Street between 9th and 11th Streets with Defendants' knowledge and invitation. SXSW marketed and encouraged music industry professionals such as Steven Craenmehr to attend the music festival for business

purposes. SXSW issued Steven Craenmehr credentials to attend the festival for business purposes. SXSW sponsored an official music showcase within the premises for which Steven Craenmehr's SXSW-issued credentials gave him access. Defendants intended persons such as Steven Craenmehr to attend the showcase within the premises. Steven Craenmehr entered the premises in order to attend the showcase. For all these reasons, Steven Craenmehr was within the premises at the express invitation of Defendants.

151.    Steven Craenmehr entered the premises for the mutual benefit of himself and Defendants. SXSW profited from the sale of festival credentials to Steven Craenmehr. SXSW also profited from the attendance of music industry professionals such as Steven Craenmehr because it recruited bands to play the festival upon the implied promise that music industry professionals would watch their shows. The recruitment of bands is what allowed SXSW to profit from credentials sold to attendees.  Steven Craenmehr profited because his access to music showcases such as the one within the premises allowed him to network with other music industry professionals and to scout new music talent for his employer, Massive Music. By inviting Steven Craenmehr, SXSW owed him a duty to exercise the standard of care that a very cautious and prudent person would have done under the same or similar circumstances.

### 3. The condition created by the SXSW Defendants' failure to deploy adequate traffic control measures posed an unreasonable risk of harm to invitees.

152.    Traffic control measures that were inadequate to prevent errant vehicles— including an errant vehicle operated by an intoxicated driver—from penetrating the section of Red River that SXSW intended to close to vehicular traffic posed an unreasonable risk of harm to festivalgoers including SXSW's invitees such as and including Steven Craenmehr. A music festival that is deliberately held in a central business district of a metropolitan city surrounded with and crisscrossed by live lanes of traffic without deploying traffic control measures sufficient

to prevent an errant vehicle from colliding with pedestrians who are congregating in and coming or going from a designated venue under the festival operator's control poses an unreasonable risk of harm to persons the festival has invited into the premises.

153.    SXSW required festival attendees, including invitees such as Steven Craenmehr, to enter the venue zone to gain access to official SXSW venues. By doing so without deploying adequate traffic control measures to prevent an errant vehicle from breaching the venue zone created an unreasonable risk of harm from errant vehicle collisions with pedestrians and bicyclists.

### 4.    The SXSW Defendants had actual knowledge of the dangerous condition.

154.    Because SXSW deliberately established a venue on Red River Street and invited festival pass holders to attend the venue and congregate in the street while at the same time implementing traffic control measures it knew were inadequate to prevent an errant vehicle from penetrating the venue zone and simultaneously failing to deploy traffic control measures that would be sufficient to stop an errant vehicle from penetrating the venue zone, the SXSW Defendants had actual knowledge of the dangerous condition that it had created.

### 5.    The SXSW Defendants knew or should have known the dangerous condition posed an unreasonable risk to Steven Craenmehr.

155.    The SXSW Defendants knew or should have known that the traffic control plan and the traffic control measures were inadequate for their intended purpose because the occurrence of collisions between errant vehicles and pedestrians in locations adjacent to live lanes of traffic is well documented and well known, particularly to traffic control professionals. In addition, SXSW has been engaged in hosting this festival in substantially the same format—in

and around the streets of Austin's Central Business District and in and adjacent to bars and other music venues—for 27 years.

156.    Defendants knew or should have known that an errant vehicle collision was foreseeable because there are approximately 20,000 errant vehicle incidents in the United States every year. Any collision between an errant vehicle and a pedestrian or bicyclist is likely to result in serious injury or death. In recent years, several high profile incidents involving errant vehicles penetrating pedestrian and bicycle areas such as the Santa Monica Farmer's Market, the Venice Beach boardwalk, and the Austin Hike and Bike Trail have resulted in serious injuries and deaths. Thus the general danger to Steven Craenmehr from an errant vehicle was foreseeable.

157.    Public intoxication and driving while intoxicated in Austin's Central Business District during the SXSW festival are well-known facts both because of the elevated number of arrests each year during SXSW in the Central Business District where the Festival takes place and because of the media's coverage of the issue. Thus the danger to Steven Craenmehr from an errant vehicle, including but certainly not limited to one, driven by an intoxicated person was foreseeable.

158.    SXSW expected and encouraged attendees to travel throughout Austin's Central Business District as pedestrians and on bicycles. SXSW purposefully designed the festival so that pedestrians and attendees on bicycles would be forced to congregate in and travel through areas immediately bordered by live lanes of traffic. SXSW recognized the risks and took steps— however inadequate—to institute traffic control measures and close streets to traffic. The proper deployment of adequate traffic control measures including of rigid barriers is and has been obvious throughout Austin's Central Business District. Thus, the SXSW Defendants knew or

51

should have known that attendees such as Steven Craenmehr who were placed in the immediate vicinity of inadequate traffic control measures were at risk of serious injury or death.

159.    The consequences of placing the burden on SXSW to ensure that its festival attendees, including its invitees, are safe and secure while attending official festival events and patronizing festival venues is *de minimus* for an event that generates tens of millions of dollars in revenue each year for the festival operators.

160.    Proper traffic control measures are widely available and widely used throughout Austin's Central Business District. Adequate traffic control measures would have been easily set up and taken down, even in an emergency situation. Water-filled rigid barriers can be drained in one minute and then moved by a single person. In addition, Defendants—being a festival promoter with 27 years' experience in holding a music festival in an urban, downtown Austin and traffic design consultants who's occupation it is to manage traffic around crowds—had superior knowledge of the general danger posed by errant vehicles.

161.    The consequences of placing this burden on the SXSW Defendants will result in a safer environment for festival attendees and eliminate the risk of collisions between errant vehicles and festival attendees who are present in a given area to attend SXSW events.

162.    Therefore, the collision between the errant vehicle that penetrated the SXSW festival venue on Red River Street between 9th and 11th Streets, and the ensuing injuries and deaths that occurred, including the death of Steven Craenmehr, was foreseeable to the SXSW Defendants.

### 6. The SXSW Defendants breached their legal duty to Steven Craenmehr by failing to reduce, eliminate, or warn of the risk of an errant vehicle.

163.    The SXSW Defendants, as the temporary possessor of the premises, breached their legal duty to Steven Craenmehr by failing to exercise reasonable care to reduce or eliminate

the risk of an errant vehicle or warn of the risk. Furthermore, because Steven Craenmehr was a business invitee of SXSW, the SXSW Defendants breached their legal duty to Steven Craenmehr by failing to exercise the standard of care that a very cautious and prudent person would have done under the same or similar circumstances.

164.    SXSW—as temporary possessor of the premises—had the right and ability to propose, recommend, institute, and require that the traffic control plan and attendant traffic control measures were adequate to protect against the risk of an errant vehicle penetrating a SXSW festival zone. This includes the SXSW designated festival zone on Red River between 9th and 11th Streets. The SXSW Defendants included the 1000 block of Red River in the traffic control plan submitted to the city but failed to designate adequate traffic control measures to protect festival attendees, such as and including its invitee Steven Craenmehr, from sustaining bodily injury and death from a collision with an errant vehicle. As such, the SXSW Defendants failed to exercise reasonable care to reduce or eliminate the risk of an errant vehicle collision.

### 7.  The SXSW Defendants' breach proximately caused Steven Craenmehr's death and the Plaintiffs' damages.

165.    SXSW's failure to use reasonable care to reduce or eliminate the risk was a proximate cause of Steven Craenmehr's death. SXSW's failure to deploy adequate traffic control measures was the direct and but for cause-in-fact of Steven Craenmehr's death because readily available and commonly utilized rigid barricades would have stopped the errant vehicle from penetrating the SXSW designated area. If the errant vehicle was prevented from penetrating the area designated by SXSW as part of its festival zone, the errant vehicle would not have collided with Steven Craenmehr on Red River Street. But for the SXSW Defendants' failure to exercise reasonable care to prevent errant vehicles from colliding with its festival attendees, including

invitees such as Steven Craenmehr, Steven Craenmehr would not have suffered fatal injuries and his spouse and child would not have sustained the damages from his death.

> **8. Alternatively, the SXSW Defendants released a dangerous agency onto the roadway adjacent to the premises that they controlled.**

166.    SXSW had a duty to protect invitees from the unreasonable and foreseeable risk of harm resulting from the dangerous condition existing in SXSW's festival zone between 9th and 10th Streets on Red River.  The SXSW Defendants knew or should have known that they had created a dangerous opportunity for errant vehicles, thereby placing nearby SXSW invitees at an unreasonable and foreseeable risk of harm.

167.    SXSW knew or reasonably should have known of the danger to its invitees and others posed by drivers in downtown Austin, many of whom were not Austin residents, who become disoriented and drive in an unsafe manner either because of their unfamiliarity with the City's street layout or street closures or because of their impaired judgment after the consumption of alcohol. SXSW knew or should have known that the thousands of SXSW music festival attendees would be consuming alcohol as they "bar hopped" late into the night from one showcase to another at official SXSW bar venues. The SXSW Defendants knew or should have known that the thousands of others sharing Austin's downtown streets during the SXSW music festival would also be consuming alcohol and driving. Given the well-publicized problem in Austin with drunken driving in the downtown area especially, the SXSW Defendants should have known that drunken drivers in their cars posed a danger to SXSW attendees unless proper measures were taken to protect SXSW festival zones, like the one created on Red River between 9th and 10th Streets, from vehicular traffic.

168.    SXSW did not exercise reasonable care to reduce or eliminate the risk caused by vehicular traffic inside the SXSW festival zone.  Despite its knowledge, actual and/or

constructive, of the drunk driving problem in Austin, SXSW failed to take adequate or any measures to reduce or eliminate the risk of harm posed by the accessibility of the festival zone on Red River between 9th and 10th Streets to errant vehicular traffic. SXSW failed to require the use of or to use itself adequate and/or effective and/or a sufficient number of barriers and/or trained safety personnel to block vehicular traffic that might attempt to enter or exit the SXSW festival zone. SXSW thereby created itself a dangerous condition on it festival zone premises between 9th and 10th Streets and Red River.

169.     Had the dangerous condition not existed on the premises of SXSW's festival zone, no driver would have been able to enter the festival zone to travel north of 9th Street on Red River in the first place. Further, no driver would have been able to exit the festival zone to travel north of 10th Street and Steven Craenmehr would not have been killed. The dangerous condition on SXSW's premises directly and proximately caused the death of Steven Craenmehr, deceased, and Plaintiffs' damages.

### 9.  Joint and Several Liability of the SXSW Defendants

170.     At all material times the SXSW Defendants were agents, servants, employees, partners, authorized agents and/or joint venturers of one another and the acts of each SXSW Defendant were within the course and scope of the agency, employment, partnership, and/or joint venture such that each SXSW Defendant is jointly and severally liable for the damages they collectively caused Plaintiffs.

171.     The allegations of Count 4 are likely to have greater evidentiary support after a reasonable opportunity for further investigation and discovery.

**Count 5. Public Nuisance by the SXSW Defendants**

172.        Plaintiffs incorporate by reference all of the allegations contained in the foregoing paragraphs as if they were fully restated in Count 5.

> **1.  The SXSW Defendants' conduct was a public nuisance.**

173.        Defendants' negligence in deploying inadequate traffic control measures negatively affected the people of the City of Austin at large and the general population of festival attendees because many of the citizens of Austin and festival attendees were traumatized by the events surrounding the crash. Defendants' conduct in deploying inadequate traffic control measures was unreasonable because it interfered with public health and safety as well as the peace and comfort of the community, all of which the public has a right to without interference, by frightening and traumatizing the general public. In addition, the Defendants' failure to use traffic control measures that were adequate to prevent this errant vehicle crash caused the tax payers of Austin and Travis County to incur substantial financial costs associated with first responders and emergency medical services for the injured and killed, including the autopsy performed on Steven Craenmehr to determine his cause of death. Defendants' negligence was therefore a public nuisance.

> **2.  Steven Craenmehr's wife and child have common-law standing to bring a public nuisance cause of action.**

174.        Steven Craenmehr suffered a special harm that was substantial and different from the harm suffered by the general public of the City of Austin and by the general population of festival attendees because was seriously injured and killed. Thus Steven Craenmehr's wife and child have common-law standing to bring this cause of action.

### 3.  Joint and Several Liability of the SXSW Defendants

175.     At all material times the SXSW Defendants were agents, servants, employees, partners, authorized agents and/or joint venturers of one another and the acts of each SXSW Defendant were within the course and scope of the agency, employment, partnership, and/or joint venture such that each SXSW Defendant is jointly and severally liable for the damages they collectively caused Plaintiffs.

176.     The allegations of Count 5 are likely to have greater evidentiary support after a reasonable opportunity for further investigation and discovery.

### Count 6. Negligent Hiring, Supervision, Training, and Retention by SXSW

177.     Plaintiffs incorporate by reference all of the allegations contained in the foregoing paragraphs as if they were fully restated in Count 5.

### 1.  Duty

178.     SXSW hired Defendant Patrick Lowe, Defendant Traffic Design Consultants, traffic control personnel, and others to plan and implement its Traffic Control Plan and to plan, implement, oversee, install, manipulate, and uninstall its traffic control measures. There was an employer-employee relationship between SXSW (as employer) and Lowe, Traffic Design Consultants, traffic control personnel, and other as-yet-unknown personnel (as employees). Lowe, Traffic Design Consultants, traffic control personnel, and other as-yet-unknown personnel [hereinafter "employees"] were employees of and had an employee-employer relationship with SXSW whether they were independent contractors or were hired by SXSW in a more traditional sense as direct employees.

### 2. Breach

179.      SXSW hired unqualified persons to plan and implement its Traffic Control Plan and to plan, implement, oversee, install, manipulate, and uninstall its traffic control measures. SXSW failed to use ordinary care to determine whether its employees were competent and qualified to be hired to plan and implement its Traffic Control Plan and to plan, implement, oversee, install, manipulate, and uninstall its traffic control measures. SXSW knew or should have known that information regarding its employees' lack of qualifications would have caused a reasonable festival organizer not to hire those employees. For instance, SXSW knew or should of known that Patrick Lowe was not a licensed Civil Engineer. SXSW knew or should have known that hiring these employees created a risk of harm to the public.

180.      SXSW failed to use ordinary care to adequately supervise its employees as they planned and implemented its Traffic Control Plan and as they planned, implemented, oversaw, installed, manipulated, and uninstalled its traffic control measures.

181.      SXSW failed to use ordinary care to adequately train its employees as they planned and implemented its Traffic Control Plan and as they planned, implemented, oversaw, installed, manipulated, and uninstalled its traffic control measures. A reasonably prudent festival organizer of a downtown, urban festival drawing tens or hundreds of thousands of attendees would have provided training beyond what SXSW provided to its employees.

182.      SXSW failed to use ordinary care in retaining its employees because it failed to remain knowledgeable about its employees' competence and fitness to plan and implement its Traffic Control Plan and to plan, implement, oversee, install, manipulate, and uninstall its traffic control measures. SXSW knew or should have known that the continued employment of its unqualified employees to plan and implement its Traffic Control Plan and to plan, implement,

oversee, install, manipulate, and uninstall its traffic control measures created an unreasonable risk of harm to others.

183.     SXSW's employees were negligent in how they planned and implemented its Traffic Control Plan and as they planned, implemented, oversaw, installed, manipulated, and uninstalled its traffic control measures.

### 3.  Proximate Cause

184.     SXSW's negligence in hiring, supervising, training, and retaining its employees was a substantial factor that caused Steven Craenmehr's death. But for the negligent hiring, supervision, training, and retention of SXSW's employees to plan and implement its Traffic Control Plan and to plan, implement, oversee, install, manipulate, and uninstall its traffic control measures, an errant vehicle would not have been able to penetrate the ostensibly closed section of Red River causing Steven Craenmehr's death.

185.     The incursion of an errant vehicle, particularly one operated by an intoxicated person, into the cordoned off section of Red River Street at 9th Street was a foreseeable event because there are approximately 20,000 errant vehicle collisions annually. Moreover, there have been numerous high profile errant vehicle collisions in and around sections of streets that are temporarily closed for pedestrian events such as farmer's markets, including the 2003 Santa Monica Farmer's Market collision that left 10 people dead and 18 seriously injured. That errant vehicle was not driven by an intoxicated person but was otherwise similar to the incident that occurred on March 13, 2014 at the SXSW Music Festival on Red River Street between 9th and 11th Streets. Because of the high number of arrests for driving while intoxicated during SXSW in the Central Business District each year, for at least the last five years preceding the 2014 SXSW Music Festival, SXSW knew or should have known of the risk that intoxicated persons

were operating motor vehicles in the immediate vicinity of the section of Red River that the SXSW Defendants possessed and to where it invited pedestrians and bicyclists to congregate.

### 4. Gross Negligence

186.    SXSW's hiring, supervision, training, and retention of Defendant Patrick Lowe, Defendant Traffic Design Consultants, traffic control personnel, and others to plan and implement its Traffic Control Plan and to plan, implement, oversee, install, manipulate, and uninstall its traffic control measures involved an extreme degree of risk given the foreseeability and probability of an errant vehicle incident and the magnitude of potential harm from such an incident.

187.    SXSW had actual awareness of the risk of a collision between an errant vehicle and a pedestrian or bicycling attendee but nonetheless proceeded with conscious indifference to the safety and welfare of the festival attendees in its hiring, supervision, training, and retention decisions. Defendants had actual awareness that such a collision would result in serious bodily injury or death.

### 5. Joint and Several Liability of the two SXSW entities

188.    At all material times SXSW Holdings, Inc. and SXSW, LLC were agents, servants, employees, partners, authorized agents and/or joint venturers of one another and the acts of SXSW Holdings, Inc. and SXSW, LLC were within the course and scope of the agency, employment, partnership, and/or joint venture such that SXSW Holdings, Inc. and SXSW, LLC are jointly and severally liable for the damages they collectively caused Plaintiffs.

189.    The allegations of Count 6 are likely to have greater evidentiary support after a reasonable opportunity for further investigation and discovery.

## Count 7. SXSW's Breach of Warranty

190.    Plaintiffs incorporate by reference all of the allegations contained in the foregoing paragraphs as if they were fully restated in Count 7.

### 1.    SXSW sold services to Steven Craenmehr.

191.    SXSW sold and issued credentials to Steven Craenmehr to attend the festival for business purposes.

### 2.    SXSW made representations to Steven Craenmehr about the quality of its services.

192.    SXSW marketed and encouraged Steven Craenmehr to attend the music festival for business purposes. These business purposes included networking with other music industry professionals and scouting new talent for record contracts. Implicit in these marketing efforts and advertisements was the representation that it would be safe to attend the festival.

### 3.    SXSW's representations became part of basis of the bargain with Steven Craenmehr.

193.    Steven Craenmehr would never have attended the festival if he had not been led to believe it would be safe for him to do so.

### 4.    SXSW breached its warranty to Steven Craenmehr.

194.    SXSW failed to deploy adequate traffic control measures and this failure constituted a breach of warranty to Steven Craenmehr.

### 5.    SXSW's breach of its warranty to Steven Craenmehr proximately caused Steven Craenmehr's death.

195.    SXSW breached its warranty to Steven Craenmehr by failing to provide a safe and secure environment through use of adequate traffic control measures. The inadequate traffic control measures deployed by Defendants were a substantial factor in bringing about Steven

*Lizzy Plug, et al. v. SXSW, et al.*, **Plaintiffs' Original Complaint**

Craenmehr's serious injuries and death. If Defendants' traffic control measures had been adequate, Steven Craenmehr would not have been seriously injured and killed. But for their breach of warranty through the use of inadequate traffic control measures, Steven Craenmehr would not have been seriously injured and killed.

196.    A festival organizer of ordinary intelligence would have anticipated the danger created by inadequate traffic control measures. Defendant knew or should have known that an errant vehicle incident was foreseeable because there are approximately 20,000 errant vehicle incidents in the United States every year. Any collision between an errant vehicle and a pedestrian or bicyclist is likely to result in serious injury or death. In recent years, several high profile incidents involving errant vehicles penetrating pedestrian and bicycle areas such as the Austin Hike and Bike Trail, the Santa Monica Farmer's Market, and the Venice Beach boardwalk have resulted in serious injuries and deaths. Thus the general danger to Steven Craenmehr from an errant vehicle was foreseeable.

197.    In addition, public intoxication and driving while intoxicated in Austin's Central Business District during the SXSW festival are well-known problems both because of the elevated number of arrests each year and because of the media's coverage of the issue. Thus the general danger to Steven Craenmehr from an errant vehicle driven by an intoxicated person was foreseeable.

198.    SXSW expected and encouraged attendees to travel throughout Austin's Central Business District as pedestrians and on bicycles. SXSW purposefully designed the festival so that pedestrians and attendees on bicycles would congregate in areas immediately bordered by live lanes of traffic. SXSW recognized the risks and took steps—however inadequate—to institute traffic control measures and close streets to traffic. The proper deployment of adequate

traffic control measures including of rigid barriers is and has been obvious throughout Austin's Central Business District. Thus, SXSW knew or should have known that attendees such as Steven Craenmehr who were placed in the immediate vicinity of inadequate traffic control measures were at risk of serious injury or death.

199.     The cost to defendant of deploying adequate traffic control measures is *de minimus* given the tens of millions of dollars in revenue that the festival generates each year for SXSW's owners and operators. Proper traffic control measures are widely available and widely used throughout Austin's Central Business District. Proper traffic control measures would have been easily set up and taken down, even in an emergency situation. Water-filled rigid barriers can be drained in one minute and then moved by a single person.

200.     Defendants—being a festival promoter with 27 years' experience in holding a music festival in an urban, downtown Austin and traffic design consultants who's occupation it is to manage traffic around crowds—had superior knowledge of the general danger posed by errant vehicles.

### 6.  Joint and Several Liability of the two SXSW entities

201.     At all material times SXSW Holdings, Inc. and SXSW, LLC were agents, servants, employees, partners, authorized agents and/or joint venturers of one another and the acts of SXSW Holdings, Inc. and SXSW, LLC were within the course and scope of the agency, employment, partnership, and/or joint venture such that SXSW Holdings, Inc. and SXSW, LLC are jointly and severally liable for the damages they collectively caused Plaintiffs.

202.     The allegations of Count 7 are likely to have greater evidentiary support after a reasonable opportunity for further investigation and discovery.

**Count 8. Negligence by Rashad Owens**

203.        Plaintiffs incorporate by reference all of the allegations contained in the foregoing paragraphs as if they were fully restated in Count 8.

### 1.  Duty - Rashad Owens owed a legal duty to Steven Craenmehr.

204.        Defendant had a legal duty to exercise ordinary care and operate the vehicle he was driving reasonably and prudently because every driver has the duty to exercise ordinary care and operate his or her vehicle in a reasonable and prudent manner.

### 2.  Breach - Rashad Owens breached his legal duty to Steven Craenmehr.

205.        Defendant failed to obey instructions from police officers, failed to obey traffic laws, failed to obey traffic control measures designed to deter vehicles, failed to timely apply his brakes, failed to maintain a proper lookout, failed to maintain proper control of the vehicle that he was driving, and failed to turn the vehicle to avoid colliding with pedestrians and bicyclists, including Steven Craenmehr.

### 3.  Causation - Rashad Owens' breach of his legal duty to Steven Craenmehr was a cause of Steven Craenmehr's death.

206.        Rashad Owens's negligent driving was a substantial factor in bringing about Steven Craenmehr's serious injuries and death. A person of ordinary intelligence would have anticipated the danger created by failing to obey instructions from police officers, failing to obey traffic laws, failing to obey traffic control measures designed to deter vehicles, failing to timely apply his brakes, failing to maintain a proper lookout, failing to maintain proper control of the vehicle that he was driving, and failing to turn the vehicle to avoid colliding with pedestrians and bicyclists. Owens' conduct as stated above was therefore a factor in causing Steven Craenmehr's death.

### 4. Gross Negligence - Rashad Owens was grossly negligent.

207.    Rashad Owens' failure to obey instructions from police officers, failure to obey traffic control measures designed to deter vehicles, failure to timely apply his brakes, failure to maintain a proper lookout, failure to  maintain proper control of the vehicle that he was driving, and failure to turn the vehicle to avoid colliding with pedestrians and bicyclists involved an extreme degree of risk given the foreseeability and probability that a collision with a pedestrian or bicyclist would cause serious bodily injury or death.

208.    Rashad Owens should have had actual awareness of the risk that serious injury or death could result from his failure to obey instructions from police officers, failure to obey traffic control measures designed to deter vehicles, failure to timely apply his brakes, failure to maintain a proper lookout, failure to maintain proper control of the vehicle that he was driving, and failure to turn the vehicle to avoid colliding with pedestrians and bicyclists.

209.    These allegations are likely to have greater evidentiary support after a reasonable opportunity for further investigation and discovery.

## VI.   DAMAGES

210.    Plaintiffs incorporate by reference all of the allegations contained in the foregoing paragraphs as if they were fully restated in this section on damages.

### A.  Survival Damages for Personal Injuries to Steven Craenmehr

211.    M.C. is the only heir at law to the estate of Steven Craenmehr. His mother, Plaintiff Lizzy Plug, therefore brings this suit on M.C.'s behalf for damages suffered and sustained by Steven Craenmehr pursuant to TEXAS CIVIL PRACTICES AND REMEDIES CODE section 71.021. Plaintiff seeks damages for the funeral and burial expenses incurred because of Steven Craenmehr's wrongful death. Plaintiff seeks damages for the loss of Steven Craenmehr's

life itself and related pecuniary loss including economic loss based on what Steven Craenmehr would have earned had he lived. Plaintiff seeks exemplary damages.

212.       Plaintiff seeks recovery of survival damages within the jurisdictional limits of this Court, in an amount to be determined by a jury.

### B.  <u>Wrongful Death Damages</u>

213.       Plaintiffs are the surviving wife and mother of Steven Craenmehr, deceased. Plaintiff Lizzy Plug appears individually and on behalf of her son, M.C., the only biological child of Steven Craenmehr. Plaintiff Lidy Smit appears individually. Plaintiffs bring this suit for damages suffered by them and M.C. as a result of the wrongful death of Steven Craenmehr pursuant to TEXAS CIVIL PRACTICE AND REMEDIES CODE section 71.004.

214.       At the time of his death, Steven Craenmehr was 35 years old and in good health with a normal life expectancy.

215.       Steven Craenmehr was a loving and dutiful husband to his wife, Lizzy Plug. Steven provided Lizzy with financial support as well as joy, happiness, and the anticipation of all the pleasures that a husband can bring to his wife. Steven provided Lizzy with care, maintenance, love, comfort, advice, counsel, and society, and it was anticipated that he would continue to do so for a long time into the future.

216.       Steven Craenmehr was a loving and dutiful father to his son, M.C. Steven provided M.C. with financial support as well as joy, happiness, and the anticipation of all the pleasures that a father can bring to his son. Steven provided M.C. with care, maintenance, love, comfort, advice, counsel, and society, and it was anticipated that he would continue to do so for a long time into the future.

217.     Steven Craenmehr was a loving and dutiful son to his mother, Lidy Smit. Steven provided Lidy with financial support as well as joy, happiness, and the anticipation of all the pleasures that a son can bring to his mother. Steven provided Lidy with care, maintenance, love, comfort, advice, counsel, and society, and it was anticipated that he would continue to do so for a long time into the future.

218.     As a result of Steven Craenmehr's wrongful death, his wife, mother, and child have suffered damages in the past—including termination of the marital relationship, child-parent relationship, and the parent-child relationship—loss of consortium, loss of companionship and society, and severe mental anguish. Lizzy, Lidy, and M.C. will, in reasonable probability, continue to suffer such damages in the future. As a result of Steven Craenmehr's wrongful death, his wife, mother, and child have suffered the past and future loss of household services, loss of inheritance, loss of Steven's past and future earning capacity.

219.     Plaintiffs seek recovery of wrongful death damages including pecuniary loss within the jurisdictional limits of this Court, in an amount to be determined by a jury.

**C.  Punitive Damages**

220.     Plaintiffs incorporate by reference all of the allegations contained in the foregoing paragraphs as if they were fully restated in this section on damages.

221.     The acts of Defendants as described were intentional, wanton, malicious, and oppressive, and thus entitle Plaintiffs to an award of punitive damages.

**VII.  DEMAND FOR JURY TRIAL**

222.     Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury.

*Lizzy Plug, et al. v. SXSW, et al.*, **Plaintiffs' Original Complaint**

## VIII.   PRAYER

223.        WHEREFORE, Plaintiffs respectfully pray that Defendants be duly cited to appear and answer herein, and that upon final trial of this cause, Plaintiffs recover a judgment against Defendants for:

- Plaintiffs' damages, as set forth above, in an amount within the jurisdictional limits of this Court, to be determined by a jury;

- Prejudgment interest on Plaintiffs' damages as allowed by law;

- Interest on the judgment at the legal rate from date of judgment;

- Costs of court; and,

- Such other and further relief to which Plaintiffs may be entitled.

December 18, 2014                                Respectfully submitted,

                                                 /s/Scott M. Hendler

                                                 **Hendler Lyons Flores, PLLC**
                                                 1301 W. 25th Street, Suite 400
                                                 Austin, Texas 78705
                                                 Telephone: 512-439-3202
                                                 Facsimile: 512-439-3201
                                                 www.hendlerlaw.com

                                                 Scott M. Hendler
                                                 Texas Bar No. 09445500
                                                 shendler@hendlerlaw.com

                                                 Sean M. Lyons
                                                 Texas Bar No. 00792280
                                                 slyons@hendlerlaw.com

                                                 Rebecca Ruth Webber
                                                 Texas Bar No. 24060805
                                                 rwebber@hendlerlaw.com

**Law Office of Clem Lyons, PC**
126 Villita Street
San Antonio, Texas 78205
Telephone: 210-225-5251
Facsimile: 210-225-6545
www.clemlyonslaw.com

Clem Lyons
Texas Bar No. 12742000
mdoege@clemlyonslaw.com

ATTORNEYS FOR PLAINTIFFS